RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0010p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

KEITH SAUNDERS,

*Plaintiff-Appellant,*

*v.*

FORD MOTOR COMPANY; JEFF MARZIAN; KAREN
MORRISON,

*Defendants-Appellees.*

No. 17-5277

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:14-cv-00594—Joseph H. McKinley Jr., Chief District Judge.

Argued: November 29, 2017

Decided and Filed: January 11, 2018

Before: GILMAN, SUTTON, and STRANCH, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Brian G. Abell, ADAMS HAWYARD & WELSH, Louisville, Kentucky, for
Appellant. Jessica V. Currie, BUSH, SEYFERTH & PAIGE, PLLC, Troy, Michigan, for
Appellees. **ON BRIEF:** Brian G. Abell, ADAMS HAWYARD & WELSH, Louisville,
Kentucky, for Appellant. Jessica V. Currie, Stephanie A. Douglas, BUSH, SEYFERTH &
PAIGE, PLLC, Troy, Michigan, for Appellees.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. This case involves claims by Keith Saunders
against his employer, Ford Motor Company, under both § 301 of the Labor Management

Relations Act (LMRA), 29 U.S.C. § 185, and Kentucky law. Saunders contends that Ford breached the applicable collective bargaining agreement (CBA) by twice placing him on temporary leave—known as no-work-available (NWA) status—and that his local union breached its duty of fair representation by failing to fully pursue his grievances. He also alleges that Ford retaliated against him by placing him on NWA status not long after he reopened a workers' compensation claim against the company.

The district court granted Ford's motion for summary judgment on all of Saunders's claims. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Factual background

#### 1. *Saunders's employment at Ford*

Ford's entire workforce is governed by a CBA negotiated between the United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) and the company. Agreements and Letters of Understanding negotiated by local UAW bargaining units and Ford provide additional contractual requirements at the plant level.

Shortly after beginning work at Ford's Twin Cities Plant in 2001, Saunders injured his right arm when it got caught in a machine called an electric nutrunner that he inadvertently switched on while being trained to install coolant lines in car radiators. The injury has caused him to lose almost all use of that arm.

Saunders received workers' compensation benefits while he recovered from the injury. When he returned to work, his doctors imposed temporary work restrictions that prohibited him from lifting heavy loads, engaging in repetitive motions, or using his right arm. Those restrictions eventually became permanent.

The UAW often struggles to secure permanent job placements for medically restricted Ford workers like Saunders. And Saunders's post-injury employment history reflects those difficulties. In the initial aftermath of Saunders's injury, Ford assigned him to a series of temporary jobs. The company next assigned him to an airbag-installation job, but placed him on

NWA status when he developed carpal-tunnel syndrome from the work. Ford eventually assigned Saunders to a torque-inspector job, a position that involves using a handheld computer to check nuts and bolts on vehicles for tightness. Saunders worked in that position for nearly eight years.

Ford transferred Saunders to the company's Louisville Assembly Plant in January 2012, following the closure of the Twin Cities Plant. The Louisville Plant was in flux at the time because of a massive transfer of workers to the plant as dozens of other Ford plants shuttered across the country. The Louisville Plant was also beginning production of a new vehicle at that time. The plant's 1,200-person workforce ballooned to 4,000 workers virtually overnight. As the Louisville Plant contended with the flood of new workers and the demands of bringing a new vehicle online, it desperately needed trained and experienced torque inspectors. These circumstances allowed Saunders to continue working as a torque inspector for another year, even though he lacked the seniority for the position at the new plant.

But once the Louisville Plant integrated the new workers, it reopened the torque-inspector jobs to the normal bid process. A more senior worker displaced Saunders in January 2013. The record lacks clarity on Saunders's precise employment history over the subsequent two years, but there is no dispute that he was placed in several short-term jobs punctuated by periods of medical leave and being on NWA status. And Saunders's medical records reflect repeated efforts by Ford's Medical Placement Committee to assign him to positions that accommodated his medical restrictions.

One such assignment occurred in August 2013 when a physician in Ford's medical department determined that a job in the paint department met Saunders's medical restrictions. Ford mailed Saunders a letter directing him to report to work two days later, which he did. The following day, however, Saunders went to the plant's medical department with the complaint that he had developed diarrhea, an upset stomach, and sinus congestion from the paint fumes. But the medical department informed him that he had no restrictions that would prevent him from working in the paint department, so he was not excused from work.

Saunders returned to the medical department the following day with similar complaints. He was then advised to consult his personal physician. Two days later, Saunders reported back to the medical department with a note from his personal physician concluding that the paint-department job was unsuitable for Saunders. The medical department then added new restrictions to Saunders's file that prohibited him from working in the paint department. As a result, Saunders returned to NWA status. Saunders eventually got a permanent assignment in August 2014 when Ford placed him in a final-line-inspector job, a position that he retains to this day.

### 2. *Grievances*

In the 16 months prior to his 2014 permanent medical placement, Saunders filed at least two grievances with his union. (Saunders's appellate counsel stated at oral argument that Saunders has filed as many as ten grievances during his tenure with Ford, but the record refers to only two such grievances.) He first filed an April 2013 grievance on behalf of himself and other NWA-status workers, complaining that Ford failed to fill temporary driving jobs with medically restricted workers. Although Ford eventually did assign medically restricted workers to the temporary driving positions, the grievance sought backpay for 80 workhours during which at least some of the NWA-status workers were not placed in jobs that they could have performed. Ford responded to the grievance by arguing that it is contractually obligated to place medically restricted workers in permanent positions only. The union withdrew the grievance in July 2015 after Saunders had already commenced this lawsuit.

Saunders initiated a second grievance in December 2013. At oral argument, counsel for Ford explained that there was a December 2013 meeting attended by Saunders, a nurse, a union bargainer, and a member of the Medical Placement Committee. The union declined to take further action on this grievance after that meeting. In May 2014, the union filed a second-stage grievance form related to this complaint. It alleged that Ford had wrongly placed Saunders on NWA status in December of an unspecified year (presumably 2013) without first "walk[ing] [Saunders] thru the final area and go[ing] by a list from the company that has the lowest assembler to the [h]ighest assembler to see if he could do one [of] those jobs."

### 3. EEOC charges

Saunders filed two charges with the Equal Employment Opportunity Commission (EEOC). His first EEOC charge related to a position he held in Minneapolis, before he became a torque inspector. The EEOC concluded that no discrimination had occurred, and Saunders did not pursue a lawsuit against Ford related to that charge. Saunders filed his second EEOC charge in August 2013, arguing that he should have been allowed to stay in his temporary torque-route inspector job in January 2013. Ford found Saunders a temporary job in the trim department in September 2013, which resolved his second EEOC charge.

### 4. Workers' compensation claim

Saunders also sought to reopen his original workers' compensation claim (from his 2001 injury) in July 2013. Even though he had already exhausted his workers' compensation benefits, Saunders hoped that reopening his claim would force Ford to find him a permanent assignment and end his repeated bouts of being placed on NWA status. The workers' compensation claim prompted Ford to make a settlement offer of $100,000 in exchange for, among other things, Saunders's resignation from Ford. Saunders declined the settlement offer.

## B. Procedural background

Saunders filed suit in a Kentucky state court, alleging that Ford and its supervisory employees Jeff Marzian and Karen Morrison (collectively, "Ford") discriminated against him on the basis of disability and retaliated against him for filing (1) a discrimination charge with the EEOC, (2) a workers' compensation claim, and (3) grievances with his union. Ford removed the case to the United States District Court for the Western District of Kentucky, arguing that Saunders's state-law claims were completely preempted by § 301 of the LMRA because they depended on or required interpretation of the CBA that governs Saunders's employment.

After the close of discovery and Saunders's filing of an amended complaint, Ford moved for summary judgment. The district court granted the motion, holding that all of Saunders's state-law claims, other than his workers' compensation retaliation claim, were completely preempted by § 301 of the LMRA. *Saunders v. Ford Motor Co.*, No. 3:14-CV-00594-JHM,

2016 WL 6868155, at \*3–\*8 (W.D. Ky. Nov. 18, 2016). Rather than dismiss the state-law claims, however, the court recharacterized them as § 301 claims. *Id.* at \*8. Saunders does not challenge this recharacterization on appeal.

The district court subsequently concluded that Saunders failed to produce sufficient evidence from which a jury could find in his favor on either his § 301 claims or his workers' compensation retaliation claim. *Id.* at \*8–10. Accordingly, it granted Ford's motion for summary judgment. *Id.* at \*8, \*10. Saunders then filed a motion to vacate the entry of judgment, which the court denied. This timely appeal followed.

## II. ANALYSIS

### A. Standard of review

We review de novo a district court's grant of summary judgment. *Watson v. Cartee*, 817 F.3d 299, 302 (6th Cir. 2016). Summary judgment is appropriate when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden to "demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Finally, "[i]n making this assessment, [the court] must view all evidence in the light most favorable to the nonmoving party." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 301 (6th Cir. 2016).

### B. The CBA

#### 1. Medical-placement procedures

Seniority governs much of Ford's employment policies. As stated in Article IV, § 2, of the CBA, "Promotions shall be based primarily upon merit and ability, but where these are equal, the employee having the greatest seniority shall receive preference." The CBA, however, provides an exception to the seniority rules when it comes to medically restricted workers: "Any employee who has been incapacitated at his regular work by injury . . . while employed by the Company may be employed in other work, in the plant or in any Unit of a multi-unit plant, which

he can do at the discretion of the Company after consultation with the Union without regard to any seniority provisions." CBA art. VIII, § 27. Under this provision, in other words, a medically restricted worker can displace a more senior worker who is not medically restricted. But this exception to the seniority rules does not apply "when a disparity in seniority of more than two years exists." *Id.*

A 2013 Letter of Understanding negotiated between Ford and UAW Local 862 provides a detailed procedure for medical placement at the Louisville Plant. Under the procedures set forth in the Letter, plant management must "attempt to place restricted personnel on appropriate operations consistent with their capabilities, limitations and seniority prior to placing them on No Work Available."

To facilitate this process, a Plant Placement Committee (also known as the Medical Placement Committee) meets periodically to make medical placements. The Committee consists of the relevant department's team manager, the relevant bargaining unit's union representative, and the unit's health and safety representative. A plant physician, staff nurse, human resource associate, safety engineer, plant ergonomist, physical therapist, and worker compensation representative also participate in the Committee meetings. The Committee "review[s] [plant] operations starting with the lowest seniority employee within the department of the restricted employee for placement" with the assistance of the plant's medical staff. This means that lower seniority workers are the most exposed to displacement by medically restricted workers.

If the initial review identifies no placement opportunity, then the Committee is authorized to exercise the seniority exception set forth in Article VIII, § 27 of the CBA and place medically restricted workers in positions occupied by workers up to two years ahead of them in seniority. The Letter further provides that the Committee's review must include efforts to place workers in "nontraditional capacities such as sorting, inspecting, driving[,] etc." prior to placing them on NWA status.

### 2. *Grievance procedures*

Article VII of the CBA sets forth grievance procedures by which workers can challenge actions taken by Ford that they believe violate the agreement. The CBA expressly provides that

any grievance "that either (a) is not processed or (b) is disposed of in accordance with this Grievance Procedure shall be considered settled, and such settlement shall be final and binding upon the Company, the employee or employees involved, and the Union and its members." CBA, art. VII, § 1.

Ford workers must first attempt to resolve grievances against the company through informal oral conversations with either their supervisor or their union representative. *Id.* § 2(a). If an oral conversation between the employee or the employee's union representative and the employee's supervisor does not resolve the issue, then the union representative "shall meet with the Superintendent" who oversees the worker's supervisor "and another representative designated by the local plant Management to discuss the grievance within two working days." *Id.* § 2(b).

The failure of this first-stage process to resolve grievances triggers the second stage of the process for those grievances that the union "believes . . . to be well founded." *Id.* § 2(d). At the second stage, a union representative must reduce the grievance to writing within two working days after the conclusion of the oral discussions. *Id.* §§ 2(d), 3(a). The union must then present the grievance to Ford management within one week. *Id.* § 3(b). A Unit Committee comprised of union and Ford representatives meets weekly to discuss pending written grievances, *id.* § 3(c), and the company must issue a written decision responding to each grievance within one week after the meeting at which the grievance is discussed, *id.* § 3(f). Under the CBA, the union "ha[s] power to withdraw a Second Stage Grievance." *Id.* § 3(e).

But the union may, if it "considers the grievance to be well founded," appeal an unfavorable decision to the Plant Review Board (a panel comprised of three union and three Ford representatives) within one week of the issuance of a written second-stage decision. *Id.* § 4, 4(a), (d). Ford must then issue a written decision within one week of the Review Board's meeting to discuss a third-stage grievance. *Id.* § 4(g). Under the CBA, the union "ha[s] power to withdraw a Third Stage Grievance." *Id.* § 4(h).

The union may, however, appeal an unfavorable third-stage decision to an impartial "Umpire" within four weeks of the issuance of the Review Board's written decision. *Id.* § 8. An

Umpire's ruling is "final and binding on the Union, its members, the employee or employees involved and the Company," and "[n]either the Union nor its members will attempt to bring about the settlement of any claim or issue on which the Umpire is empowered to rule by any other means." *Id.* § 19. In other words, the CBA prohibits employees from litigating contractual disputes. *See id.*

## C. Claims under § 301 of the LMRA

Although Article VII, § 19 of the CBA prohibits workers from litigating contractual disputes with the company, the Supreme Court has recognized that such contractual provisions "work[] an unacceptable injustice when the union representing the employee in the grievance/arbitration procedure acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation." *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164 (1983). Under such circumstances, an employee may bring a suit pursuant to § 301 of the LMRA. Section 301 provides a cause of action for litigants bringing suits in federal court to challenge "violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185(a). Such suits can be brought against "the employer and[/or] the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding." *DelCostello*, 462 U.S. at 164–65. And employees as well as unions may initiate § 301 suits. *Smith v. Evening News Ass'n*, 371 U.S. 195, 200 (1962).

The Supreme Court has characterized employee actions under § 301 as "hybrid" suits containing "two causes of action," one against the employer for breach of the CBA and another against the union for "breach of the union's duty of fair representation, which is implied under the scheme of the National Labor Relations Act." *DelCostello*, 462 U.S. at 164–65. "A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190 (1967). Whether or not the employee elects to sue the employer, the union, or both, the employee must prove (1) a breach of the CBA, and (2) a breach of the union's duty of fair representation. *DelCostello*, 462 U.S. at 165.

Saunders's amended complaint, the operative one in this action, alleges several violations of Kentucky law that the district court recharacterized as claims brought pursuant to § 301 of the LMRA. *Saunders*, 2016 WL 6868155, at *8. Although § 301 provides a narrow exception to the grievance procedures outlined in the Ford-UAW CBA, "[a]n employee seeking a remedy for an alleged breach" of a CBA "must attempt to exhaust any exclusive grievance and arbitration procedures established by that agreement before he may maintain a suit against his union or employer under § 301(a) of the Labor Management Relations Act." *Clayton v. UAW*, 451 U.S. 679, 681 (1981). The district court therefore correctly confined its review of Saunders's § 301 claims to the issues raised in Saunders's April 2013 and December 2013 grievances.

### 1. The April 2013 grievance

Saunders has provided no evidence that the UAW breached its duty of fair representation in connection with his April 2013 grievance. He argues that UAW official Herb Hibbs's deposition testimony that the union filed one of Saunders's grievances only to "appease" him supports his claim. But Hibbs's deposition testimony refers to the *December 2013* grievance, not the *April 2013* grievance. And even if Hibbs had been discussing the earlier grievance, the primary thrust of the remark is that the union surpassed its duty of fair representation by filing the grievance on Saunders's behalf even though it felt that the claim lacked merit.

More generally, Saunders argues that the union "fail[ed] to fully pursue" his grievances and instead "merely put forth a token effort to address the problem." The union, however, pursued Saunders's April 2013 grievance to the second stage of the process by pressing his concern that he and other NWA-status workers were not given priority in 2013 when temporary driving jobs became available. Ford issued a decision in response that justified its actions on the basis that the positions "are not considered permanent available positions, where NWA employees would be called in to fill." Even though the union had no obligation to do so if it did not believe the grievance was "well founded," *see* CBA art. VII, § 4, the UAW appealed that determination to the Plant Review Board (an appeal that it withdrew at a later date).

Based on the record, the April 2013 grievance does not appear to be entirely meritless. The Louisville Plant's medical-placement procedures make clear that "nontraditional capacities

such as sorting, inspecting, driving[,] etc." must be exhausted "prior to placing . . . [an] employee on NWA." Nothing in the record limits the prioritization of medically restricted workers to only *permanent* available positions. But Ford's appellate counsel explained at oral argument that, as a practical matter, the company could not have placed Saunders or other medically restricted workers in the temporary driving positions at issue in the grievance due to the very brief duration of the job (at most two weeks) when the Medical Placement Committee meets only once per week.

Saunders, of course, is not bound by Ford's explanation for why it did not place him or other NWA workers in the temporary driving positions. His insurmountable legal problem, however, is that "a breach of the duty of fair representation is not established merely by proof that the underlying grievance was meritorious." *Vaca*, 386 U.S. at 195. Section 301 does not permit the court to second-guess the union's apparent determination that the April 2013 grievance lacked merit after it diligently filed the grievance, gathered evidence and argued Saunders's case during second-stage proceedings, and appealed the negative determination to the Review Board. *See id.* at 194. The district court therefore did not err in granting summary judgment in favor of Ford on the claim arising out of Saunders's April 2013 grievance.

### 2. The December 2013 grievance

Turning now to Saunders's claim arising out of his December 2013 grievance, Ford argues that the claim is time-barred. A six-month statute of limitations applies to hybrid § 301 suits. *Garrish v. UAW*, 417 F.3d 590, 594 (6th Cir. 2005). "Such a claim accrues when an employee discovers, or should have discovered with [the] exercise of due diligence, acts giving rise to the cause of action." *Wilson v. Int'l Bhd. of Teamsters, Chauffers, Warehousemen & Helpers of Am., AFL-CIO*, 83 F.3d 747, 757 (6th Cir. 1996). Accordingly, "a party is not required to sue on a hybrid claim until . . . the party reasonably should know that the union has abandoned the party's claim." *Id.*

Saunders filed this suit in a Kentucky state court on July 30, 2014. Any § 301 claim that accrued prior to January 30, 2014, is therefore time-barred. Saunders's December 2013 grievance was the subject of a December 16, 2013, meeting among UAW official Fred Willard, a

nurse, and a member of the Medical Placement Committee. If the union believed the grievance to be well founded, it had two working days after that meeting to reduce it to writing as part of the second stage of the grievance process. *See* CBA, art. VII, §§ 2(d), 3(a). The union declined to do so, ending the Grievance Procedure and disposing of the grievance. *See id.* § 1. Any claim arising from the union's decision not to pursue this grievance therefore began to accrue on December 19, 2013, and had expired by the time Saunders filed this action in Kentucky state court on July 30, 2014.

The union's belated filing of a second stage grievance in May 2014 does not change this analysis. Only the union's decision not to pursue the December 2013 grievance within the two-day window provided under the CBA could be construed as a breach. The union's subsequent acquiescence to Saunders's complaints of nonaction in May 2014 does not change the fact that the contractual Grievance Procedure began in December 2013 and that the union elected not to pursue his grievance within the contractual window, which closed on December 18, 2013. Because Saunders's § 301 claim arising out of the December 2013 grievance expired over a month before he initiated suit, it is time-barred.

## D. Workers' compensation claim

This brings us to Saunders's final claim, which alleges that Ford violated Kentucky law by retaliating against him for reopening his workers' compensation claim in July 2013. Kentucky law prohibits employees from being "harassed, coerced, discharged, or discriminated against in any manner whatsoever for filing and pursuing a lawful" workers' compensation claim. Ky. Rev. Stat. Ann. § 342.197(1).

Claims under this statute are analyzed under a burden-shifting framework that requires the employee to establish a prima facie case of workers' compensation retaliation. *Colorama, Inc. v. Johnson*, 295 S.W.3d 148, 152 (Ky. Ct. App. 2009). Saunders argues that the district court erred in analyzing his claim using the burden-shifting framework. But his sole authority for this argument is a *Harvard Law Review* article that catalogues concurrences by Justice Scalia criticizing such legal tests. Needless to say, neither a law-review article nor Justice Scalia's concurrences bind us in analyzing Saunders's workers' compensation claim under Kentucky law.

If an employee is able to establish a prima facie case of workers' compensation retaliation under Kentucky law, then the burden shifts to the employer to provide a legitimate, non-retaliatory reason for its conduct, which the employee then has the opportunity to expose as pretextual by a preponderance of the evidence. *Dollar Gen. Partners v. Upchurch*, 214 S.W.3d 910, 915–16 (Ky. Ct. App. 2006). A prima facie case of workers' compensation retaliation under Kentucky law requires evidence that "(1) [the plaintiff] engaged in a protected activity; (2) the defendant knew that the plaintiff had done so; (3) adverse employment action was taken; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Colorama*, 295 S.W.3d at 152 (quoting *Dollar Gen. Partners*, 214 S.W.3d at 915).

Saunders asserts that Ford's efforts to, in his view, force him to resign his position as a condition for settling his workers' compensation claim constitutes an adverse employment action. But Saunders did not accept the settlement offer and continues to work for Ford to this day. An adverse employment action is one that materially alters the terms and conditions of an individual's employment. *See Brooks v. Lexington-Fayette Urban Hous. Auth.*, 132 S.W.3d 790, 803–04 (Ky. 2004) (defining an adverse employment action in the context of an employer's alleged retaliation for the employee's filing of an employment-discrimination complaint). The district court properly concluded that the rejected settlement offer did not constitute an adverse employment action because it did not change the terms and conditions of Saunders's employment. *See Saunders*, 2016 WL 6868155, at *9.

As an alternative basis for his workers' compensation retaliation claim, Saunders asserts that his placement on NWA status on August 27, 2013, amounted to an adverse employment action. But the district court held that Saunders provided insufficient proof of a causal connection between the reopening of his workers' compensation claim on July 9, 2013, and his placement on NWA status a month and a half later because he provided no evidence connecting the two events beyond the attenuated temporal proximity. *Saunders*, 2016 WL 6868155, at *9. The court also held that, even if Saunders had established a prima facie case based on his placement on NWA status, "Ford . . . presented ample evidence that Saunders' placement on NWA status was done for a legitimate, non-retaliatory reason. Specifically, Ford has offered

proof that it placed Saunders on NWA [status] because Saunders had complained about paint fumes bothering him in his [then-]current job in the paint department." *Id.* at *10.

Ford's medical department added restrictions to Saunders's file that required his removal from the paint department only after Saunders visited the medical department following his first and second days on that job and after he obtained a note from his personal physician, Dr. Jeff Anderson, requesting that Saunders be removed from the assignment. And even though Saunders initiated the process that resulted in his removal from the medical placement, Ford took additional steps to try to avoid his return to NWA status. Dr. Lawrence Simpson from Ford's medical department visited the paint department following Saunders's complaints to assess the ventilation, temperature, odor, lighting, and safety equipment in the department. He identified "no definite work causation for Mr. Saunders['s] symptoms."

When Saunders returned to the medical department with a note requesting his removal from the paint department, another Ford doctor called Dr. Anderson and pressed him on whether a "direct correlation" existed between Saunders's symptoms and the conditions in the paint department. Only after attempting to mitigate any potential causes of Saunders's symptoms and consulting with Saunders's personal physician did Ford place Saunders back on NWA status in response to the new restrictions. Accordingly, the record demonstrates that Ford had a legitimate, nonretaliatory reason for placing Saunders on NWA status that no reasonable juror could conclude was pretextual. We therefore need not examine whether Saunders presented sufficient proof of a causal connection between the reopening of his workers' compensation claim and his placement on NWA status a month and a half later.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgement of the district court.