RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0222p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

GARY MCNEAL,

        *Plaintiff-Appellant*,

    *v.*

CITY OF BLUE ASH, OHIO; DAVID WALTZ, individually and in his official capacity as City Manager of the City of Blue Ash; SCOTT NOEL, individually and in his official capacity as Chief of the Blue Ash Police Department,

        *Defendants-Appellees*.

No. 23-3180

---

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:19-cv-01072—Michael R. Barrett, District Judge.

Decided and Filed:  September 23, 2024

Before: WHITE, THAPAR, and BLOOMEKATZ, Circuit Judges.

---

## COUNSEL

**ON MERITS AND SUPPLEMENTAL BRIEFS:**  Zachary Gottesman, GOTTESMAN & ASSOCIATES, Cincinnati, Ohio, Christopher Wiest, CHRIS WIEST, ATTY AT LAW, PLLC, Covington, Kentucky, for Appellant.  Dawn M. Frick, SURDYK, DOWD & TURNER, Dayton, Ohio, for Appellees Waltz and Noel in their official capacities and for Appellee City of Blue Ash.  Kirk M. Wall, H. Devon Collins, DINSMORE & SHOHL LLP, Columbus, Ohio, for Appellees Waltz and Noel in their individual capacities.

―――――――――――

**OPINION**

―――――――――――

HELENE N. WHITE, Circuit Judge.  Plaintiff-Appellant Gary McNeal appeals the grant of summary judgment to Defendants-Appellees—the City of Blue Ash, David Waltz, and Scott Noel—in this action stemming from the alleged humiliation, scrutiny, and discipline McNeal experienced in the final years of his employment as a police officer and the termination of that employment.   Because McNeal cannot show that age was the "but-for" reason for the termination of his employment, we AFFIRM the district court as to that claim, but we REVERSE on McNeal's claim of a hostile work environment against Blue Ash.

## I.  Facts

In November 2018, the City of Blue Ash terminated McNeal's employment as a police officer.  McNeal had over thirty-three years of experience in law enforcement—of those, the last seventeen years were with the Blue Ash Police Department (the "Department").  At the time of his dismissal, McNeal was sixty-one years old—the oldest officer in the Department.

McNeal maintains that he had an "almost perfect record" through 2015, and that things began to change shortly after Noel—now the police chief—was promoted to a supervisory position around 2015 and to chief in 2017.  Appellant's Brief at 1.  McNeal alleges that he faced discriminatory and disproportionate discipline under Noel's leadership.

### A.  Disciplinary History

McNeal's issues with the Department started in 2016 when he challenged his performance evaluation from the previous year.  Shortly after, McNeal's supervisors assigned him to conduct a traffic study at a local intersection, requiring him to provide weekly updates on his progress.  Traffic studies were usually assigned to Blue Ash's traffic-safety department, rather than to patrol officers, and McNeal claims that no other police officer employed by the department was assigned a similar task while he was there.  McNeal believes that the assignment was punishment for disputing his evaluation scores, but also cites it as evidence of age

discrimination.  He claims that the assignment was intended to frustrate and embarrass him, and to give the Department a reason to discipline him when he inevitably failed.

Then, from April 2016 to July 2017, Noel and Sergeant Rob Gerhardt disciplined McNeal six times for violations of the Department's policies.  To start, Blue Ash required counseling for McNeal in April 2016 because he failed to turn on his microphone during a traffic stop.[1]  Then, McNeal received an oral reprimand in December 2016 for failing to turn in training certificates on time.  The same month, Blue Ash reprimanded McNeal in writing for failing to follow a supervisor's command to update two police reports.  In January 2017, the Department issued McNeal a one-day suspension for failing to respond to a noise complaint at a construction site in a timely manner.  In June 2017, the Department suspended McNeal for three days because he failed to file the correct form after returning to work from a six-week medical leave.  Finally, Blue Ash suspended McNeal for four days in July 2017 for failing to follow up on an assigned police report despite receiving numerous reminder emails over a three-month period.

In December 2017, Noel was promoted to police chief and, a few months later, Noel had a meeting with McNeal to discuss his performance.  McNeal told Noel that he believed he was being "paper trailed"—that his supervisors were creating a disciplinary record based on minor infractions to make it easier to fire him in the future.  R. 27, PID 687.  McNeal also told Noel that he did not appreciate receiving formal discipline instead of verbal warnings and requested that Noel not "rubber stamp" discipline against him in the future.  *Id.* at 687.  McNeal testified that, by the end of the meeting, Noel had validated his concerns.  Noel, however, believed the conversation was productive.

**B. Final Incident**

On June 26, 2018, the Department dispatched McNeal to a local restaurant in response to a 911 call describing a potential overdose.  As McNeal left the police station, the description of

---

[1]Documented "counseling" is a type of discipline where a supervisor meets with an employee to provide a copy of departmental policy, counsels the employee on how to comply with the policy, and makes a record of the intervention.  R. 25, PID 331.  Because McNeal was identified as "one of the primary offenders" of the Department's microphone policy, McNeal met with his supervisors informally in April 2016 to discuss his compliance.  *Id.*  Shortly after, McNeal made another traffic stop without activating his microphone, at which point Noel issued the documented counseling.

the situation changed from potential overdose to a "non-breather"—the individual suffered from a heart condition, not a drug overdose. R. 27, PID 742. At the time, McNeal knew that CPR was being administered to the individual and that an ambulance was on the way. Because an officer accompanies every ambulance in Blue Ash, McNeal was still obligated to respond even though no criminal activity was suspected. McNeal was the principal officer assigned to the incident, but three other officers were involved: Sergeant Edward Charron was assigned as the secondary officer to accompany McNeal; Officer Dane Baumgartner self-dispatched after hearing about the incident; and Noel drove to the restaurant to "spot check" the performance of his officers in a situation where someone might die. R. 25, PID 340–41.

McNeal took one minute and fifty-four seconds to exit the police station and reach his vehicle. Then, he sat in his vehicle for fifty-two seconds before leaving the station. McNeal testified that it took him a few moments to read the details of the dispatch and he had to wait for Noel to pull his car out of the parking lot in front of him. On his way to the restaurant, which was 1.4 miles away, McNeal did not use his lights or siren. A few officers testified that, in these types of emergencies, officers generally stay behind ambulances as an "unwritten rule" to avoid interfering with the medical response. R. 37, PID 2406.

Noel arrived at the restaurant first, four minutes and nineteen seconds after the dispatch. Baumgartner and McNeal arrived next—five minutes and twenty-one seconds after the initial dispatch—even though Baumgartner left the station seventy-three seconds after McNeal. Charron arrived last, six minutes and forty-seven seconds after the dispatch.

Unfortunately, the individual with the heart condition passed away. McNeal's and Charron's "slow" responses made no difference in the situation; but expressing concern that the response time could be the difference "between life and death" in the future, and believing McNeal and Charron had taken excessive time in the past, Noel authorized an investigation into the incident. R. 25, PID 286–87; R. 29-1, PID 1116.

## C. Investigation and Termination

Blue Ash requires its officers to be familiar with the Department's policies. In cases of emergency, the Department requires officers to respond with their lights and siren activated,

which is called a "Code 3" response. R. 25, PID 288; R. 27-5, PID 995–96. Because officers are exempt from many traffic laws when they respond Code 3, this rule hastens an officer's response. Officers have some discretion to decide when to respond Code 3, but they must "immediately notify Dispatch" if they respond without lights and a siren. *Id.* Without Code 3, officers must follow all regular traffic laws.

The investigation into the episode uncovered multiple policy violations—both on the day of the incident and in the preceding months. The report concluded that McNeal was "inexcusably delayed" in his response to the "non-breather," which required an emergency response, R. 27-7, PID 1018, and that McNeal had violated a number of Department policies, some over 100 times.

First, McNeal violated departmental policy by failing to notify dispatch that he would not respond Code 3. Second, he violated policy by exceeding the speed limit without invoking Code 3. McNeal drove fifty-one miles per hour through a forty-mile-per-hour zone and forty-six miles per hour through a twenty-five-mile-per-hour zone. The investigation found that McNeal had violated the same policy three months earlier, when he traveled fifty-seven miles per hour through a twenty-five-mile-per-hour zone without a Code 3 response. Third, the report concluded that McNeil violated policy by failing to demonstrate familiarity with the Department's rules.

Fourth, McNeal violated the Department's policy requiring officers to use a microphone to record each traffic stop.[2] Out of the thirty-seven traffic stops McNeal conducted in 2018, he failed to use a microphone twenty-nine times. Fifth, McNeal violated the Department's policy requiring officers to verify that their in-car camera functions properly at the beginning of each shift. According to the report, McNeal failed to properly check his in-car camera for the entire first half of 2018—not once in 109 shifts. Noel testified that these violations were serious

---

[2]Blue Ash explains that although the investigators focused on McNeal's response to the "non-breather," they wanted to check whether McNeal's responses to other recent episodes had been satisfactory. The first video investigators reviewed was from a traffic stop earlier in July, but it had no audio. As a result, the investigators checked a few of McNeal's recent traffic stops, none of which had audio either. At that point, investigators decided to review all of McNeal's traffic stops for the year.

because they stymied the Department's ability to gather evidence against defendants and increased the Department's legal exposure.

Sixth, McNeal violated the Department's policy requiring officers to be truthful during an investigation interview. McNeal told investigators that he checked his in-car camera "most of the time" and that he "tr[ied] to" use his microphone for every traffic stop. R. 27-7, PID 1021. Because it appeared that McNeal regularly violated the Department's camera and microphone policies, investigators determined that his statements were not truthful. The report further concluded that, under the county prosecutor's interpretation of *Brady v. Maryland*, 373 U.S. 83 (1963), the Department would be required to disclose to criminal defendants that McNeal had a history of dishonesty should he ever be called to testify.[3] Because the ability to testify as a credible witness is an essential function of an officer's job, investigators believed that McNeal was no longer qualified for his position.

After outlining McNeal's new infractions together with his prior disciplinary history, the report recommended that McNeal's employment be terminated. Chief Noel forwarded the report to Waltz, the city manager, expressing his agreement. Noel asserted that McNeal's untruthfulness alone was sufficient to warrant termination because it inhibited his ability to perform his essential job duties. Additionally, because the violations regarding recording equipment were so pervasive, Noel believed that McNeal's violations had been "willful." R. 27-7, PID 1002.

The Department offered McNeal the opportunity to retire voluntarily or to attend a pre-disciplinary hearing, but McNeal declined both alternatives. Ultimately, Blue Ash terminated McNeal's employment. McNeal filed a grievance through his union; the parties went to arbitration, and the arbitrator upheld the termination decision.

---

[3]In 2011, the Hamilton County prosecutor sent a letter to the Department detailing his interpretation of *Brady*, which he believed required disclosure of "any impeaching evidence regarding the credibility and veracity of all witnesses — including police officers." R. 25-1, PID 455. The prosecutor wrote that this included any information regarding an officer's "past misconduct or relevant disciplinary action contained in internal affairs files." *Id.* As a result, the prosecutor recommended that the Department adopt "strict termination policies for officers found to be untruthful in reports, testimony or interviews." *Id.* Noel testified that the county prosecutor's office had a general rule against proceeding with cases where a key testifying police officer had a record of dishonesty.

McNeal brought this action against Waltz, Noel, and the City of Blue Ash.  In his Second Amended Complaint, McNeal raised federal and state claims of retaliation, racial discrimination, and age discrimination.  Defendants moved for summary judgment on all claims.  Because McNeal's brief opposing summary judgment addressed only his age-discrimination claims, the district court concluded that the other claims were abandoned.  The district court also granted summary judgment on the ADEA claims, holding that McNeal put forth insufficient facts to show that Defendants' legitimate, non-discriminatory reasons for termination were pretextual or that he was subject to age-based harassment.

McNeal appeals the district court's grant of summary judgment on his age-discrimination claims but does not attempt to revive the abandoned claims.

## II.  Standard of Review

We review the district court's grant of summary judgment de novo.  *Lowe v. Walbro LLC*, 972 F.3d 827, 831 (6th Cir. 2020).  Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Saunders v. Ford Motor Co*., 879 F.3d 742, 748 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The moving party bears the burden of demonstrating that there is no genuine dispute of material fact.  *Id.*  Because McNeal is the non-moving party, we must accept his evidence as true and draw all reasonable inferences in his favor.  *Logan v. Denny's, Inc*., 259 F.3d 558, 566 (6th Cir. 2001).

## III.  Disparate-Treatment Claim

The Age Discrimination in Employment Act of 1967 ("ADEA") prohibits employers from taking adverse employment actions against employees over the age of forty due to their age.  29 U.S.C. §§ 623(a), 631(a) (2018).  To succeed on a disparate-treatment claim under the ADEA, a plaintiff must show, by a preponderance of the evidence, that age was the "but-for" cause of an adverse employment decision.  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176–78 (2009).  Meeting the ADEA's requirement is "no simple task" because it requires plaintiffs to

show that age was the "determinative reason" they were terminated. *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 323–24 (6th Cir. 2021).[4]  Here, to defeat Defendants' motion for summary judgment, McNeal must show a "material fact that, if resolved in h[is] favor, could persuade a reasonable juror that age was the but-for cause of h[is] termination." *Id.* at 324.

A plaintiff may show a violation of the ADEA through either direct or circumstantial evidence. *Id.*  Direct evidence is evidence that "explains itself," *id.* (quoting *Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672, 683 (6th Cir. 2016)), because it "proves the existence of a fact without requiring any inferences," *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004).  Circumstantial evidence, by contrast, requires factfinders to draw inferences from the evidence to determine that a plaintiff's termination was based on age. *Pelcha*, 988 F.3d at 324.  McNeal does not point to any direct evidence of age discrimination and relies on circumstantial evidence to make his claim.

### A. *McDonnell Douglas*

We use the *McDonnell-Douglas* burden-shifting framework to analyze discrimination claims based on circumstantial evidence. *Id.*; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–06 (1973).  The *McDonnell Douglas* analysis has three steps.  First, a plaintiff must establish a prima facie claim of discrimination. *Pelcha*, 988 F.3d at 326.  To do so, a plaintiff must show that the plaintiff (1) was a member of a protected class (older than forty years old); (2) suffered an adverse employment action; (3) was qualified for the position held; and (4) was replaced by someone outside of the protected class or similarly situated non-protected employees were treated more favorably. *Id.*  If a plaintiff successfully makes a prima facie claim of discrimination, the burden of production "shifts to the employer to identify a legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* at 325.  If the employer identifies a legitimate reason, the burden shifts back to the plaintiff to prove that the employer's reason is pretextual. *Id.*

---

[4]The ADEA's standard is stricter than Title VII's, where plaintiffs need demonstrate only that their membership in a protected class is a "motivating factor" in an adverse employment decision. *Gross*, 557 U.S. at 174.

The parties dispute whether McNeal met the requirements of a prima facie case of age discrimination. We assume, without deciding, that McNeal has met his burden on the first step of *McDonnell Douglas*. Appellees argue that they disciplined and eventually fired McNeal because of his misconduct, not for any discriminatory reason. Because McNeal has not made an adequate showing of pretext supporting that his age was the but-for reason for the termination of his employment, we conclude that summary judgment was properly granted on this claim.

## B. Pretext

A plaintiff can demonstrate pretext by showing that an employer's stated reasons for an adverse employment action (1) have no basis in fact, (2) did not actually motivate the action, or (3) were insufficient to warrant the action. *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012). McNeal has the burden of producing sufficient evidence from which the jury could reasonably reject Defendants' explanation and infer that the actual reason for termination was his age. *Id.*

### 1. Basis in Fact

McNeal has not shown that the asserted reasons for his termination lacked a factual basis. Throughout his testimony, McNeal was frequently asked whether he could produce any evidence to dispute the facts that served as the basis for his discipline. McNeal repeatedly conceded that he could not produce evidence to dispute the factual basis of his prior discipline and eventual termination. As a result, the first avenue to show pretext is foreclosed.

### 2. Employer's Motivation

The second way to demonstrate pretext is by showing that the reasons given for McNeal's termination did not actually motivate the discipline and that age was the actual motivation. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515–17 (1993); *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). The district court concluded that McNeal failed to point to any evidence showing that the reason for his termination was false or that his age was the actual motivation. McNeal challenges the district court's ruling, citing testimony and declarations from officers that older officers faced increased scrutiny. *See, e.g.*, R. 35, PID 2195

(Charron testifying that "[Officer Page] was telling me that he felt he was being targeted."); R. 30, PID 1785 (Officer Mark Ziegler's declaration that "I observed older officers be placed under a lot more scrutiny than the younger officers."); R. 37, PID 2406 (Officer Christopher Zielinski's declaration that "I absolutely witnessed unfair and unlawful practices . . . that favored younger officers over older officers.").

Even if it is true that the Department *generally* scrutinized the performance of older officers to a greater degree than younger officers, McNeal has not presented sufficient evidence that the reasons given for his termination—an extensive list of disciplinary infractions that included untruthfulness—were not the true reasons. McNeal does not contest, for example, that the Department would be required to disclose his untruthfulness to defendants at trial, rendering him unable to perform an essential job duty. Nor does McNeal dispute that the Department was legitimately concerned that his pervasive failure to follow the recording policies jeopardized the Department's ability to gather evidence and limit its exposure to liability. Because the ADEA requires plaintiffs to show that age is the "but-for" cause of the disciplinary action—not simply a motivating factor—McNeal cannot proceed if his termination was at least partly caused by Defendants' non-discriminatory reasons. *Gross*, 557 U.S. at 176. He does not meet this burden on the second prong.

### 3. Sufficiency of Explanation

Finally, a plaintiff can establish pretext by demonstrating that the reasons provided by an employer are insufficient to warrant termination. *Seeger*, 681 F.3d at 285. This route usually involves the plaintiff presenting evidence that other employees, particularly outside the protected class, were not disciplined although they engaged in "substantially identical conduct to that which the employer contends motivated its discipline of the plaintiff." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012). McNeal does not need to demonstrate "an exact correlation" to another employee receiving favorable treatment to show pretext, *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998), but the two "must be similar in 'all of the *relevant* aspects,'" *id*. (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). In the disciplinary context, the relevant considerations include whether the employees (1) "dealt with the same supervisor," (2) were "subject to the same standards," and

(3) "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Pelcha*, 988 F.3d at 328 (quoting *Ercegovich*, 154 F.3d at 352). Such a showing creates a genuine issue of material fact because it undermines the credibility of the employer's reasons for the discipline and allows a factfinder to infer illegal discrimination. *Chattman*, 686 F.3d at 349.

Here, McNeal's supervisors recommended termination for numerous reasons, but noted that his untruthfulness warranted dismissal on its own. Blue Ash believed that *Brady* would require it to inform criminal defendants of McNeal's history of false statements, seriously hampering McNeal's ability to be a credible witness at trial. 373 U.S. at 83. Blue Ash accordingly determined that McNeal could no longer perform an essential function of his position. Noel cited a 2011 letter from the county prosecutor as the basis for this conclusion, which urged the department to adopt "strict termination policies for officers found to be untruthful in reports, testimony or interviews." R. 25-1, PID 455.

McNeal offered no evidence that he was treated differently than other officers with respect to his untruthful statements. In fact, McNeal did not address this issue at all in his briefs. As Defendants point out, the record reveals only one other individual who had a documented case of untruthfulness: Charron, the sergeant who, like McNeal, was slow to respond to the non-breather situation. As with McNeal, the Department offered Charron a chance to retire voluntarily or face termination. In this vital respect, McNeal cannot show that any other officer was treated differently after engaging in "substantially identical conduct" to that which motivated his discharge. *Chattman*, 686 F.3d at 349.

Because no reasonable juror could find in light of McNeal's uncontested untruthfulness that age was the but-for cause for the termination of his employment, the district court did not err in granting summary judgment on this claim.[5]

---

[5]McNeal also raised a state claim of age discrimination under Ohio law. Ohio Rev. Code. Ann. § 4112.02(A). The parties dispute whether McNeal's age-discrimination claim under state law is barred by the statute of limitations. We do not need to resolve the issue because Ohio's anti-discrimination statute closely mirrors federal law, and Ohio courts generally use federal precedent in Title VII and AEDA cases to interpret state law. *See Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio C.R. Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981); *Bucher v. Sibcy Cline, Inc.*, 738 N.E.2d 435, 442 (Ohio Ct. App. 2000); *Ercegovich*, 154 F.3d at 357 ("Under Ohio

## IV. Hostile-Work-Environment Claim

Individuals can raise a hostile-work-environment claim under the ADEA when their workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998); *see also Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834 (6th Cir. 1996) (holding that a hostile-environment claim is actionable under the ADEA as under Title VII because the statutes share similar language). McNeal argues that he was subjected to a hostile work environment consisting of two years of "repetitive, severe, humiliating, discipline and scrutiny" and assignment to a demeaning task—the 2016 traffic study. Reply Brief at 25. Unlike the first claim, which concerns the circumstances of McNeal's termination, this claim requires us to consider the circumstances of McNeal's entire disciplinary history and treatment in resolving whether his hostile-work-environment claim survives. *Compare* Appellant's Brief at 29 (citing McNeal's termination as the challenged adverse employment action in his disparate-treatment claim) *with* Appellant's Brief at 41 (arguing that McNeal was subjected to a hostile-work environment for the two years preceding his termination).

There are four elements required to establish a prima facie claim of a hostile work environment under the ADEA: (1) the employee is forty years old or older, (2) the employee was subjected to "harassment, either through words or actions, based on age," (3) the harassment affected the employee by "creating an objectively intimidating, hostile, or offensive work environment," and (4) there is some basis of liability on the part of the employer. *Crawford*, 96 F.3d at 834–35. The first and fourth elements are not in dispute. McNeal is over forty years old and he alleges that the hostile work environment was caused by his supervisors, which would subject his employer to vicarious liability.

---

law, the elements and burden of proof in a state age-discrimination claim parallel the ADEA analysis."); *Blizzard v. Marion Technical College*, 698 F.3d 275, 283 (6th Cir. 2012) (saying the same and confirming that the "but-for" standard is used). Summary judgment is appropriate on McNeal's state age-discrimination claim for the same reason as for his federal claim: McNeal cannot show that age was the "but-for" cause of his discharge.

**A. Age-Based Treatment**

Defendants argue that McNeal fails to meet the second element because he did not present any evidence that his treatment was due to his age.  However, McNeal cited testimony that older officers were regularly subjected to greater scrutiny, and highlighted examples showing that younger officers did not face discipline for their policy violations.  *See, e.g.*, R. 42, PID 2847–54 (Officer Kenneth Schrand testifying that he faced scrutiny after entering the Deferred Retirement Option Plan ("DROP") and describing an episode where somebody other than his sergeant questioned officers about Schrand's response to an incident); R. 51, PID 3319 (Sergeant Todd Stewart testifying to an example where an inexperienced officer received a promotion over officers with far more expertise); R. 35, PID 2208 (Charron testifying that the Department had him "ride along" with an officer near retirement age to scrutinize the officer's performance); *id.* at PID 2196–2198 (Charron testifying that he heard a conversation where supervisors discussed "how they would get rid of EP," an older officer, and then witnessed EP get disciplined for minor infractions); R. 51, PID 3369–72 (Stewart testifying that Officer Ballman, a younger officer, did not receive discipline after running a red light at 75 miles per hour, nor for another incident where she failed to activate her camera system during a pursuit); R. 35, PID 2216–20 (Charron testifying that Officer Owens, a younger officer, did not receive discipline after he failed to close out a report for a long period of time); *id.* at PID 2167–70 (Charron testifying that Officer Huff, a younger officer, was not disciplined for failing to respond to an emergency).

In a hostile-work-environment claim, a plaintiff may introduce evidence of "discriminatory acts or practices [directed] at the protected group of which the plaintiff is a member, and not just at the plaintiff." *Jackson v. Quanex Corp*., 191 F.3d 647, 661 (6th Cir. 1999).  The evidence, taken together and considered in the light most favorable to McNeal, could support the conclusion that McNeal's treatment during his employment was due to his age.

**B. Discrete Acts of Discrimination**

McNeal points to the following broad allegations in support of his hostile-work-environment claim: the discipline he faced in response to commonplace acts; the increased

scrutiny and surveillance he faced compared to other officers; and his supervisors' demeaning behavior.

However, it is possible that some of the facts supporting these allegations may not be used to support McNeal's hostile-work-environment claim. Following oral argument, our court decided *Ogbonna-McGruder v. Austin Peay State Univ.*, 91 F.4th 833 (6th Cir. 2024).[6] The *Ogbonna-McGruder* panel clarified the difference between discrimination claims based on disparate treatment and claims based on a hostile work environment, holding that allegations of discrete discriminatory acts otherwise actionable as independent disparate-treatment claims do not by themselves constitute harassment supporting a hostile-work-environment claim.[7] *Id.* at 839–40. That reasoning is consistent with *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986 (6th Cir. 2009), in which this court held that "[t]he failure to promote an employee . . . is a discrete act that cannot *alone* amount to a hostile work environment." *Id.* at 994 (emphasis added). Therefore, as in *Ogbonna-McGruder*, we must determine which of McNeal's allegations constitute the kind of separately actionable discrete acts that are excluded from consideration in his hostile-work-environment claim.[8] *See id.*

To begin, not every allegedly discriminatory incident is actionable simply because it is a discrete act. After all, a hostile-work-environment claim is "based on the cumulative effect of *individual* acts," many of which are not actionable on their own. *National R.R. Passenger Corp.*

---

[6]Because the new precedent may affect the outcome here, we requested supplemental briefing from the parties discussing *Ogbonna-McGruder*'s impact on McNeal's hostile-work-environment claim.

[7]*Ogbonna-McGruder*'s holding was based on our court's previous precedent that "[a] suspension, like a termination, denial of transfer, or refusal to hire, constitutes a separate actionable 'unlawful employment practice,'" and thus cannot be characterized as part of a continuing hostile work environment. *Sasse v. U.S. Dep't of Lab.*, 409 F.3d 773, 783 (6th Cir. 2005) (quoting *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)). In contrast, "a hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Morgan*, 536 U.S. at 116 (quoting 42 U.S.C. § 2000e–5(e)(1)). A hostile work environment is a kind of atmospheric hostility that, although generated by discrete incidents, hangs over the entire employment experience. It does not "occur on any particular day" because it is greater than the sum of its parts. *See id*. at 115.

[8]McNeal concedes that his suspensions and termination are excluded from consideration in his hostile-work-environment claim.

*v. Morgan*, 536 U.S. 101, 115 (2002) (emphasis added).  Accordingly, only discrete acts that are "adverse employment decision[s]" can be challenged in a disparate-treatment claim.[9]  *Id.* at 114.

An adverse employment action involves "a loss of pay or benefits, a detrimental change in responsibilities, a negative change in the terms or conditions of employment, or some other actual and unfavorable change in job status."  *Milczak v. Gen. Motors, LLC*, 102 F.4th 772, 786 (6th Cir. 2024) (quoting *Barrett v. Lucent Techs., Inc.*, 36 F. App'x 835, 841 (6th Cir. 2002)).  Until recently, many circuits—including our own—did not consider discrete acts to be adverse employment actions unless they caused a relatively high level of harm.  *See, e.g.*, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008) (requiring plaintiffs to show a "significant change in employment status" (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998))).  However, in the recent case of *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024), the Court abrogated circuit court cases across the country that required plaintiffs to show a high level of harm to challenge a discriminatory transfer.[10]  *Id.* at 353 n.1.  Although *Muldrow* involved transfers, the Court made clear that its interpretation stemmed from Title VII's generally applicable statutory language, mirrored in the ADEA, which contains no language requiring plaintiffs to show a high level of harm.  *Id.*  Thus, to challenge a discrete act in a disparate-treatment claim, the statute requires only that a plaintiff show "some harm respecting an identifiable term or condition of employment."  *Id.* at 355.  Crucially, the harm does not have to be "significant" or "serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar."  *Id*.  In short, the employment

---

[9]Appellees argue in their supplemental briefs that all of McNeal's allegations are discrete acts that cannot be raised in his hostile-work-environment claim because they "could have arguably been alleged as separate claims."  Blue Ash Supp. Brief at 6; *see* Noel Supp. Brief at 13.  However, Appellees argued earlier that all of McNeal's allegations, even *taken together*, were not serious enough to alter the conditions of his employment.  *See, e.g.*, Blue Ash Brief at 38 ("[N]o reasonable jury could find that the actions of Appellees rise to the level of sufficiently severe or pervasive to alter the conditions of employment.").  These positions appear contradictory.  On one hand, Appellees argue that the allegations collectively are not serious enough to make out a hostile-work-environment claim, but they also argue that the individual allegations are sufficiently serious to be brought as separate disparate-treatment claims.

[10]For example, the Court abrogated the Eleventh Circuit's requirement that plaintiffs show a "serious and material change in the terms, conditions, or privileges of employment," *Webb-Edwards v. Orange Cnty. Sheriff's Off.*, 525 F.3d 1013, 1031 (11th Cir. 2008) (quoting *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001)), *abrogated by Muldrow,* 601 U.S. at 346, and the Second Circuit's requirement that plaintiffs show a "materially significant disadvantage," *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000)), *abrogated by Muldrow* 601 U.S. at 346.

action is adverse if it leaves the employee "worse off respecting employment terms or conditions." *Id.* We thus recognize that *Muldrow* may displace prior cases from our circuit requiring disparate-treatment plaintiffs to show heightened levels of harm.[11]

Sometimes, it is relatively easy to determine whether an act constitutes an adverse employment action—such as "hiring, firing, [and] failing to promote." *White*, 533 F.3d at 402 (quoting *Ellerth*, 524 U.S. at 761). In other instances, however, it is more difficult to determine whether an act produces a "disadvantageous" change in "an identifiable term or condition." *Muldrow*, 601 U.S. at 347.[12]

And to make matters more complicated, an adverse employment action can affect employment terms or conditions on two registers. By definition, an adverse action can cause a change in the terms or conditions of employment. But an adverse action deployed strategically as harassment can also add to a climate of hostility that represents a different change in the terms or conditions of the job. To use the Supreme Court's words, a discrete discriminatory act may have "occurred" on one day and thus be actionable, but it also may be part of a separate harm that "occurs over a series of days or perhaps years." *See Morgan*, 536 U.S. at 110, 115. In the hostile-work-environment context, we exclude adverse actions that operate only on the first register, but consider the ones that operate on the second.

---

[11]We note that our circuit's language in *White* requiring plaintiffs to show a "significant change in employment status" was lifted from the Court's decision in *Ellerth*, 524 U.S. at 761. However, the Court clarified in a subsequent case that this language from *Ellerth* should not be read as restricting antidiscrimination claims. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006). Rather, *Ellerth*'s definition applies "only to 'identify a class of [hostile-work-environment] cases' in which an employer should be held vicariously liable (without an affirmative defense) for the acts of supervisors." *Id.* at 64 (alteration in original) (quoting *Ellerth*, 524 U.S. at 760). Thus, the Court made clear that "*Ellerth* did not discuss the scope of the general antidiscrimination provision." *Id.* at 65. However, our circuit in *White* continued to use *Ellerth*'s language broadly to define adverse employment actions. We recognize, in light of *Muldrow*, that it is no longer appropriate to categorically apply *Ellerth*'s language to classify adverse employment actions.

[12]For example, we have held that "a negative performance evaluation does not constitute an adverse employment action unless the evaluation has an adverse impact" on employment terms or conditions. *White*, 533 F.3d at 402 (quoting *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007)); *see also Jones v. City of Franklin*, 309 F. App'x 938, 944–45 (affirming the district court's conclusion that Jones's negative evaluation was not an adverse employment action because it did not affect his wage). But in *Ogbonna-McGruder*, this court held that the plaintiff's negative evaluation *was* a discrete act of employment discrimination, even though it was not accompanied by any other harm to the employment terms or conditions. 91 F.4th at 840. These cases appear to be in tension, complicating matters further. Because *White* and *Tuttle* were decided before *Ogbonna-McGruder*, we cannot ignore these earlier cases. *Helphenstine v. Lewis County*, 60 F.4th 305, 317 (6th Cir. 2023).

McNeal first cites his assignment to complete a traffic study, which he alleges was intended to demean and humiliate him and to provide his superiors with an excuse to monitor and discipline him. Appellees argue that the traffic study cannot be considered because "an employer's decision[s] to give an employee 'unattainable and undesirable work assignments' are 'discrete acts' of discrimination." Noel Supp. Brief at 11 (quoting *Ogbonna-McGruder*, 91 F.4th at 840).[13] McNeal does not argue simply that the work he had to complete was itself harassment. Rather, McNeal asserts that traffic studies require "specialized training or experience," and he was set up to fail from the beginning because he was "provided no training or direction." Appellant's Supp. Brief at 6, 9. Thus, the evidence supporting a hostile-work-environment claim is not the unfavorable assignment itself but the fact that the Department allegedly engaged in conduct designed to (1) frustrate, demean, and embarrass him in front of his coworkers; (2) justify more disciplinary action against him when he inevitably fell short of the unreasonable expectations; and (3) force him further under the microscope by requiring him to report to two supervisors on his progress weekly. The significance of the traffic study for hostile-work-environment purposes is that the Department allegedly used the assignment strategically in a broader effort to discredit McNeal.

In *Ogbonna-McGruder*, we distinguished between a work reassignment and related evidence of harassment. In that case, the defendant denied Ogbonna-McGruder's request to teach political science courses, telling her that, although she had taught courses in the department for eighteen years, she "was not qualified to teach political science." *Ogbonna-McGruder*, 91 F.4th at 838. The court determined that the reassignment itself was a separately actionable discrete act, but the accompanying explanation was a demeaning statement that could be used to support a hostile-work-environment claim. *Id.* at 840. That principle applies with equal force here.[14] Regardless whether McNeal's traffic-study assignment itself could potentially be raised

---

[13]This quote from *Ogbonna-McGruder* refers to the unpublished case of *Cecil v. Louisville Water Co.*, 301 F. App'x 490, 496 (6th Cir. 2008). In that case, however, the panel analyzed Cecil's claims—that her employer refused to train her and assigned her unattainable and undesirable work assignments—both as discrete acts of discrimination and as incidents contributing to a hostile work environment. *See id.* at 496, 499 (analyzing Cecil's claim that her employer's "denial of training and discriminatory assignments of work" contributed to a hostile work environment).

[14]We thus reject Appellees' argument that *Ogbonna-McGruder* requires us to sort every discrete act into one of two mutually exclusive buckets. Instead, we recognize that a single discrete act may contribute to different

in a disparate-treatment claim, the auxiliary evidence of harassment may be used to support a hostile-work-environment claim.

This reading of *Ogbonna-McGruder* squares with Supreme Court precedent. The Court has held that a hostile-work-environment claim is "based on the cumulative effect of individual acts" occurring over the span of weeks, months, or years. *Morgan*, 536 U.S. at 115. An individual act within a hostile-work-environment claim "*may* not be actionable on its own," *id.* (emphasis added)—but there is no requirement that the act not be independently actionable. As the Court recently explained, a hostile-work-environment claim "includes every act composing that claim, *whether those acts are independently actionable or not*." *Green v. Brennan*, 578 U.S. 547, 557 (2016) (citing *Morgan*, 536 U.S. at 115-121) (emphasis added). Thus, "even if a claim of discrimination based on a single discriminatory act is time barred, *that same act* could still be used as part of the basis for a hostile-work-environment claim." *Id.* at 562 n.7 (emphasis added). That conclusion makes good sense. Whether a given act contributes to a hostile work environment does not turn on whether that act might support a separate claim.[15]

To reconcile *Ogbonna-McGruder* with *Morgan* and *Green*, we read *Ogbonna-McGruder* to bar a plaintiff from including in a hostile-work-environment claim only those discrete acts that result in a separate discriminatory harm to the terms and conditions of employment that does not "contribut[e]" to the alleged environment of harassment. *Ogbonna-McGruder*, 91 F.4th at 840.

---

types of harms. To the extent that a discrete act, on its own, causes a change in the terms and conditions of employment, it may be challenged in a disparate-treatment claim. However, when a discrete act also contributes to a different and continuing harm—for example, the pervasive humiliation of an employee—its ancillary impacts may be considered in a hostile-work-environment claim.

[15]Our sister circuits have reached similar conclusions. *See King v. Aramark Services, Inc.*, 96 F.4th 546, 560 (2d Cir. 2024) (holding that "the same discrete act" can "support both" an individual adverse-employment-action claim and a hostile-work-environment claim); *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 223 (4th Cir. 2016) ("So long as the act is part of the pattern of discriminatory treatment against the employee," it may be included in a hostile-work-environment claim, "even if the act would otherwise qualify as a discrete act that is independently actionable."); *Baird v. Gotbaum*, 662 F.3d 1246, 1252 (D.C. Cir. 2011) (finding "no authority for the idea that particular acts cannot as a matter of law simultaneously" be independently actionable and support a hostile-work-environment claim); *Chambless v. La.-Pac. Corp.*, 481 F.3d 1345, 1350 (11th Cir. 2007) (an independently-actionable discrete act may be considered as part of a hostile-work-environment claim "[w]here the discrete act is sufficiently related" to the alleged environment of harassment); *but see Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 893 (9th Cir. 2005). To the extent these cases conflict with *Ogbonna-McGruder*, we recognize that we are bound by our in-circuit precedent.

Because the traffic-study assignment provides evidence of the environment of harassment McNeal alleges in his hostile-work-environment claim, we may consider that evidence.

Beyond the traffic-study assignment, McNeal also cites the frequent discipline he faced for minor violations. Appellees argue that each instance of discipline was a discrete act that must be raised in a disparate-treatment claim. But even if some of these disciplinary incidents were separately actionable, we would still consider whether the incidents were also weaponized as tools of harassment in the "same actionable hostile work environment practice." *Morgan*, 536 U.S. at 120. Here, there is evidence indicating that the Department imposed discipline as a vehicle to target and belittle McNeal. Notably, McNeal points to testimony that Noel was "grinning from ear to ear," "smiling," and "giggling" when discipline was meted out to McNeal. R. 35, PID 2242. Noel reportedly asked about McNeal's reaction to some discipline with excitement and enthusiasm, as though "he [was] getting off, he [was] enjoying the fact that an employee of his [was] being messed with." *Id.*

At any rate, these disciplinary incidents would not be independently actionable. Only discipline causing "some harm respecting an identifiable term or condition of employment" is actionable on its own. *Muldrow*, 601 U.S. at 355. For example, this court previously held that "[a] written reprimand, without evidence that it led to a materially adverse consequence such as lowered pay, demotion, suspension, or the like, is not a materially adverse employment action." *Creggett v. Jefferson Cnty. Bd. of Educ.*, 491 F. App'x 561, 566 (6th Cir. 2012); *see also Presley v. Ohio Dep't of Rehab. & Correction*, 675 F. App'x 507, 515 (6th Cir. 2017) (holding that documented counseling and a one-day paid suspension was not a materially adverse employment action). Here, McNeal was disciplined in several ways that likely do not meet the definition of an "adverse employment action," *Mitchell*, 389 F.3d at 182, including "documented counseling," an "oral reprimand," and a "written reprimand." R. 27-7, PID 1002. When considering the facts in the light most favorable to McNeal, none of these incidents is actionable on its own in a disparate-treatment claim.

Apart from the discipline, McNeal cites the scrutiny he faced more generally, including the fact that the Department closely monitored and thoroughly investigated him. For example, McNeal cites the fact that, during its investigation, the Department audited his camera and

microphone footage for the entire year—a level of scrutiny no other officer had experienced. We focus on the harassing effect of these incidents to assess whether the ongoing monitoring created a climate of hostility in the aggregate (and combined with other actions), not whether each incident alone changed McNeal's employment status. Therefore, McNeal's evidence of higher and disproportionate scrutiny may be used to support his hostile-work-environment claim.[16]

In sum, except for the unpaid suspensions and termination that McNeal conceded do not apply, McNeal's other evidence may be used to support his hostile-work-environment claim.

### C. Severe and Pervasive

Because hostile-work-environment claims arise out of the same statutory language as disparate-treatment claims, *Muldrow*'s holding that Title VII does not require plaintiffs to show "significant" harm applies to both types of claims. *Muldrow*, 601 U.S. at 355; *Crawford*, 96 F.3d at 834 ("The theoretical rationale for the doctrine is that sufficiently abusive harassment adversely affects a 'term, condition, or privilege' of employment within the meaning of Title VII." (quoting *Ellison v. Brady*, 924 F.2d 872, 876 (9th Cir. 1991))). Instead, the employer's discriminatory action—or, as is the case here, the work environment—needs to produce "some harm respecting an identifiable term or condition of employment." *Muldrow*, 601 U.S. at 355. Thus, when we consider whether a hostile-work environment was severe or pervasive enough to violate Title VII, we effectively ask whether it left an employee "worse off respecting employment terms or conditions." *Id*. And "[b]ecause we rely on Title VII case law in the ADEA context," we apply the same standard here. *Milczak*, 102 F.4th at 787.

"Whether harassment is sufficiently severe or pervasive to create an abusive work environment is 'quintessentially a question of fact.'" *Crawford*, 96 F.3d at 835–36. In determining whether McNeal's claim survives summary judgment, we consider the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is

---

[16]McNeal also alleged that his supervisors avoided giving him tasks and reminders in person and communicated with him via email instead. Appellant's Supp. Brief at 6. McNeal alleges that this was done intentionally because his supervisors knew he would be out on patrol for most of his shift and would be unlikely to see their messages in a timely manner. *Id*. McNeal's email-related argument is new, and Appellees had no reasonable opportunity to respond to it. *See* discussion *infra* note 14. Accordingly, we do not consider this argument in our analysis.

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). McNeal is not required to show that the harassment "seriously affect[ed] [his] psychological well being" or caused him to "suffe[r] injury"—only that the environment "would reasonably be perceived . . . as hostile or abusive." *Harris*, 510 U.S. at 22 (alteration in original) (citation omitted). Importantly, McNeal does not need to show that "each incident of harassment *standing alone* is sufficient to sustain the cause of action," but that the incidents, taken together, make out such a case. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999). Because the facts here present a close call regarding severity, we decline to do the jury's job for it: McNeal cites enough evidence for a reasonable juror to conclude he was subjected to a hostile work environment.

McNeal offers extensive testimony from officers demonstrating that he was surveilled and scrutinized for minor violations that other officers engaged in nearly every day. Ziegler testified that he "routinely" broke traffic laws and that an average officer in Blue Ash violated department policy "multiple times" each shift. R. 32, PID 1965–66, 1980. Zielinski testified that "everyone violated the speed limit laws" and that patrol officers widely disregarded traffic laws unless there was a complaint from the public. R. 39, 2557–58. And Stewart, a supervisor, testified that he had issued written discipline only a single time in the twelve months preceding his testimony. More than a half-dozen officers testified or filed declarations stating that they believed McNeal was singled out for discipline, with some saying they had never seen another officer targeted so heavily. One former sergeant testified that McNeal's supervisors enjoyed disciplining him, describing an incident where the sergeant witnessed Noel "walking on his tippy-toes" and "giggling" before issuing McNeal a suspension for a minor policy violation. R.. 35, PID 2242.

McNeal further alleges that the Department intended to humiliate him by assigning him to a traffic study that it knew he would not be able to successfully complete. *See, e.g.*, *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006) (describing that assigning employees "extra and demeaning duties" could provide a factual basis for a hostile-work-environment

claim). McNeal offers evidence that patrol officers lack the specialized training required to carry out a traffic study and that his assignment was unheard of for a patrol officer. Kelley, a thirty-year veteran in law enforcement, stated that he had never seen this task assigned to a police officer and believed it was "impossible for anyone other than a traffic engineer to complete." R. 43, PID 2973. As part of the traffic study, McNeal's supervisors placed him on increased monitoring, requiring him to provide weekly updates.

McNeal also produced evidence showing that the Department's conduct significantly affected his wellbeing—he began suffering from anxiety, forcing him to seek out medical treatment and begin taking prescription anxiety medication for the first time. This evidence lends further credence to McNeal's argument that the alleged harassment was severe or pervasive enough to alter the conditions of his employment. *See Harris*, 510 U.S. at 22 ("Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct.").

Defendants argue that McNeal's allegations, even if true, amount to trivial or irritating episodes and are not sufficiently severe or pervasive to alter the conditions of employment. However, viewing the evidence in the light most favorable to McNeal, we disagree. In a hostile-work-environment claim, it is improper to "carve the work environment into a series of discrete incidents and then measure the harm occurring in each episode." *Jackson*, 191 F.3d at 660 (quoting *Burns v. McGregor Elec. Indus., Inc.*, 955 F.2d 559, 564 (8th Cir. 1992)). Instead, the "totality of the circumstances" approach requires us to examine McNeal's treatment *cumulatively* to see whether it created an atmosphere of hostility that was more than the sum of its parts. *Id.* McNeal can defeat summary judgment if the incidents and conduct he alleges, taken together, are pervasive enough to alter the conditions of his employment, even if each is only irritating in isolation. *Id.*

Here, a jury could reasonably conclude that McNeal's conditions of employment were altered. For example, if a jury agrees that McNeal was uniquely targeted for minor policy violations and subject to significant surveillance, he would have had a different level of discretion than other officers. Many officers testified that they had freedom to carry out their regular job duties in the way they thought best. *See, e.g.*, R. 51, PID 3342–43 (Stewart testifying

that officers had some discretion in determining when an emergency existed that required a Code 3 response); R. 43, PID 2972 (Kelley affidavit explaining that "[i]t is policy and practice for Blue Ash officers to determine on a case by case basis whether the circumstances warrant a code three response."). Ziegler testified that if the Department levied discipline for each minor policy infraction, accidental or deliberate, the city "wouldn't have any police officers, to begin with." R. 32, PID 1966. Thus, a jury could conclude that McNeal was denied the discretion granted to other officers, qualifying as a "'disadvantageous' change in an employment term or condition." *Muldrow*, 601 U.S. at 354 (quoting *Oncale*, 523 U.S. at 80).

When considering the evidence in McNeal's favor, a reasonable jury could conclude that the conditions of McNeal's employment were altered. Because McNeal has demonstrated a genuine dispute of material fact as to the existence of an age-based hostile work environment, we reverse the district court's grant of summary judgment on this claim.

## V. Conclusion

For the reasons stated, we AFFIRM the district court's order granting summary judgment to Defendants on McNeal's disparate-treatment-termination claim and REVERSE the grant of summary judgment to Blue Ash on his claim of a hostile work environment.[17]

---

[17]We note that the district court held, and McNeal did not dispute, that Waltz and Noel could not be held liable in their individual capacities under the ADEA. Additionally, the district court dismissed the claims against Waltz and Noel in their official capacities because they were duplicative of the claims against Blue Ash. R. 63, PID 3886 ("Where the entity is named as a defendant, an official-capacity claim is redundant." (quoting *Foster v. Michigan*, 573 F. App'x 377, 390 (6th Cir. 2014))). McNeal did not appeal this portion of the district court's ruling. Thus, the hostile-work-environment claim may proceed against Blue Ash only.