NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0415n.06

No. 24-1889

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Sep 04, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| JACKILYN BUNNELL, | ) | |
| | ) | |
| Plaintiff-Appellant | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| WILLIAM BEAUMONT HOSPITAL, | ) | |
| Defendant-Appellee. | ) | OPINION |
| | ) | |
| | ) | |
| | ) | |

Before: GIBBONS, WHITE, and MURPHY, Circuit Judges.

WHITE, J., delivered the opinion of the court which GIBBONS, J., concurred, and MURPHY, J., concurred in part. MURPHY, J. (pp 21–27), delivered a separate opinion concurring in part and dissenting in part.

**HELENE N. WHITE, Circuit Judge.** Plaintiff Jackilyn Bunnell (Bunnell) appeals the grant of summary judgment in favor of Defendant William Beaumont Hospital (Beaumont) on her claims for pregnancy discrimination and retaliation, disability discrimination and retaliation, and Family and Medical Leave Act (FMLA) interference and retaliation. We affirm as to Bunnell's disability-discrimination and retaliation, pregnancy-discrimination-based retaliation, and FMLA retaliation claims and reverse as to her pregnancy-discrimination and FMLA interference claims.

## I.

Beginning in 2017, Bunnell worked for Beaumont as an ultrasonographer at the hospital's Royal Oak, Michigan location. Bunnell's immediate supervisor was Tracy Zeiter (Zeiter). In December 2019, Bunnell told Zeiter that she was pregnant, and Zeiter reacted positively.

Bunnell requested that she not be exposed to x-rays during her pregnancy, so Zeiter removed her from a rotation that involved x-ray exposure. During the same conversation, Bunnell asked about other accommodations for pregnant ultrasonographers. Zeiter responded that they did not need to conduct a formal process to give Bunnell accommodations and Bunnell did not need to provide a doctor's note; they could simply discuss accommodations themselves.

Around February 26, 2020, Zeiter told Bunnell that other employees had complained about Bunnell refusing to enter rooms in which there were patients with infectious diseases ("contact rooms"). Zeiter stated that the hospital's policy did not require keeping pregnant employees out of contact rooms and that Bunnell would therefore have to continue going into contact rooms. Bunnell promptly gave Zeiter a doctor's note stating that she should not be exposed to infectious diseases at work. Although this was a standard instruction for pregnant employees, Bunnell's doctor was especially concerned about her potentially contracting the flu because she had severe morning sickness. The note did not mention Bunnell's severe morning sickness, however—it merely said, "Jackilyn is pregnant and must not be exposed to any infectious disease at work[.]" (R. 20-5, Doctor's Note, PID 243). According to Bunnell, Zeiter was "very upset" about the note and said that Bunnell "was a disappointment," "was putting a strain on their department," and "had an unwillingness to bend." (R. 20-27, Bunnell Deposition, PID 495).

Later that day, Zeiter apologized to Bunnell, acknowledged that her response had been insensitive, and assured Bunnell that she would support her. During this conversation, Bunnell asked Zeiter whether she thought other employees were strained from having to cover the contact rooms for her, and Zeiter responded, "Well it could be a potential. . . . [W]e are being looked at heavily on our productivity and things like that." (R. 23-4, Conversation with Zeiter, PID 1847). Later in the conversation, Bunnell mentioned Zeiter's statement that she was straining the

2

department, and Zeiter said "it could be a potential strain on the department." (*Id.*, PID 1849). Soon after, Bunnell said, "I would never expect a manager to say those words to an employee ever under any circumstances. To tell them they are a strain on their department because they are pregnant." (*Id.*, PID 1849). Zeiter responded, "I never said that you yourself are a strain. I said it can be a strain on a department when we have limited things we can do as employees." (*Id.*). She also said, "Going into a room with the flu and putting a mask on, because you can be in the grocery store with the flu, is . . . . me wanting you to bend a little bit maybe." (*Id.*). Zeiter added, "I felt that I had bent a lot for the situation so I was just looking for a little bit of bend" and "I'm just saying. Be flexible." (*Id.*, PID 1850).

When COVID-19 (COVID) cases became prevalent at the hospital in March 2020, Zeiter told Bunnell that she would be excused from performing scans for patients with COVID. Zeiter provided the same accommodation to Deni Johnson, another pregnant ultrasonographer. During that month, because of increased patient volumes, Beaumont began redeploying employees to assignments outside of their usual duties via a program called the Labor Pool. Zeiter told the employees in charge of the Labor Pool that Bunnell was not to be exposed to COVID patients and told Bunnell that she could decline any assignment that made her feel unsafe. As a result, Bunnell declined some shifts during which she was assigned to clean COVID floors.

Zeiter arranged for Bunnell to be assigned to clean scrubs, which she described as a "disability accommodation[]" in a text message to Bunnell. (R. 23-7, Bunnell Text Messages, PID 1912). On April 11, 2020, the employee leading Bunnell's Labor Pool assignment sent Zeiter a complaint stating that Bunnell and two other employees had been "very difficult to work with" that day. (R. 20-29, Zeiter Deposition, PID 1117-18). Because of the employees' behavior during

3

their April 11th shift, a supervisor removed them from their Labor Pool shifts for the next week. Zeiter was not involved in making the decision to remove Bunnell from her shifts.

In April 2020, because of the financial impact of the COVID pandemic, Beaumont initiated a workforce adjustment that involved laying off nearly 2,250 employees. As part of this workforce adjustment, Zeiter was required to select four employees from her team to be laid off. Her supervisor gave her a suggested list of employees to lay off, which included Bunnell. Zeiter immediately agreed to lay off two of the employees on the list—an employee who was on medical leave and one who had already resigned. Zeiter told her supervisor that she was unsure why the other two employees on the list, including Bunnell, were suggested for layoffs, so her supervisor granted her additional time to determine which two additional employees to lay off.

Zeiter decided not to lay off any members of her advanced technology group, a group trained to conduct specific procedures, because she "could not afford to lose them." (*Id.*, PID 1138). She testified that in choosing employees to lay off, she looked at their years of service, as well as several pieces of data from the year 2019: the number of hours the employees worked, the number of transthoracic echocardiograms they completed, the number of limited echocardiograms they completed, the number of portable echocardiograms they completed, and how long it took them to complete an echocardiogram. She then created ranked lists of the employees on her team based on these numbers. Bunnell and Johnson, the other employee on the team who had been pregnant, were at the bottom of the rankings for most of these metrics. Zeiter testified that for this reason, she selected them for layoffs. She explained her decision-making process to her supervisor, Lauren Burgett (Burgett), who then approved her recommendations for the four employees who would be laid off. Bunnell's layoff began approximately two weeks later.

4

Bunnell delivered her baby by C-section in June 2020 and received FMLA leave for July 30, 2020 through October 21, 2020. During the summer of 2020, Beaumont implemented an effort to place laid-off employees at other locations within the organization. Bunnell's supervisors called her to inform her of this effort, and she asked what she should do given that her doctor had not yet cleared her to return to work following her C-section. They told her she should reach out to human resources (HR) for advice.

On October 6, 2020, Bunnell informed Zeiter that her doctor had cleared her to return to work on October 21st and asked whether the lab's patient volume was increasing yet. Zeiter responded that the lab was evaluating its patient volume and staffing needs each week.

On October 21st, the Lead Endotechnologist at Beaumont's Dearborn hospital emailed Zeiter and told her his department was looking for a full-time employee. He noted that Zeiter had told him someone in her department might be interested and asked whether that person was "still available." (R. 23-16, Beaumont Dearborn Emails, PID 1952). Zeiter responded that Bunnell, who was the person she had mentioned, "was furloughed and went from layoff to Medical Leave as she had a baby in the middle of her layoff status." (*Id.*). She did not mention that Bunnell expected to be cleared to return to work that same day.

Later that day, Zeiter had a meeting with Burgett in which they discussed Bunnell's employment options. When asked at her deposition whether Zeiter told her about the Dearborn position during this meeting, Burgett testified, "We wanted to make sure that we offered Jackilyn [a] Royal Oak option and I think she wanted to confirm with me that we weren't able to bring her back at that time." (R. 20-28, Burgett Deposition, PID 1029-30). After Bunnell submitted her clearance to return to work that day, Zeiter emailed Bunnell and stated that the department's patient volume was still too low for her to return to work, so she would be placed back on layoff status.

5

She also noted that Bunnell could apply to other positions within the hospital system and that HR could help her do so. But Zeiter did not mention the Dearborn position in this email to Bunnell. When asked why, Zeiter testified, "[W]e felt that it would be better if Jackilyn went through the process and worked with Talent Acquisition . . . . [We] didn't want it to be perceived as . . . we didn't want her back and we were pawning her off to somebody else." (R. 20-29, PID 1276).

In early 2021, Beaumont began a program aimed at hiring the employees who remained on layoff status for comparable positions to those they held before their layoffs. Beaumont agreed to offer a severance agreement to employees who failed to find comparable positions by February 5, 2021. On January 21, 2021, Bunnell had a conversation with Burgett and Zeiter in which they informed her that she could not return to her prior department because the patient volume was still too low and that she could work with the Talent Acquisition department to find another job within the Beaumont system. The Talent Acquisition department informed Bunnell of two available ultrasonographer positions, but Bunnell declined them both because they were part-time positions. As a result, Bunnell's employment with Beaumont ended. Beaumont offered Bunnell a severance package, but she declined it. Bunnell alleges that she was told that she would have to drop any "charges or complaints" in order to receive the package, but Beaumont denies this allegation. (R. 13, PID 108; R. 14, PID 150).

On February 21, 2023, Bunnell filed an amended complaint asserting claims for sex discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000e-2(a), and Michigan's Elliot-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101 *et seq.*; failure to accommodate in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*; disability discrimination and retaliation in violation of the ADA and Michigan's Persons with Disabilities Civil Rights Act (PWDCRA), Mich. Comp. Laws. § 37.1101 *et seq.*; interference and

6

retaliation in violation of the FMLA, 29 U.S.C. § 2601 *et seq.*; and intentional infliction of emotional distress.

Beaumont filed a motion for summary judgment after discovery, and a magistrate judge filed a Report and Recommendation (R&R) recommending that the motion for summary judgment be granted. The district court adopted the R&R over Bunnell's objections, granted summary judgment in favor of Beaumont, and dismissed the case. This appeal followed.

## II.

We review the grant of summary judgment de novo. *Lowe v. Walbro LLC*, 972 F.3d 827, 831 (6th Cir. 2020). Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Saunders v. Ford Motor Co.*, 879 F.3d 742, 748 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party bears the burden of demonstrating that there is no genuine dispute of material fact. *Id.* Because Bunnell is the non-moving party, we must accept her evidence as true and draw all reasonable inferences in her favor. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

## A.

Bunnell contends that the district court erred in dismissing her pregnancy-discrimination claims. In pregnancy-discrimination cases, a plaintiff must first demonstrate a prima facie case of discrimination by showing that "1) she was pregnant, 2) she was qualified for her job, 3) she was subjected to an adverse employment decision, and 4) there is a nexus between her pregnancy and the adverse employment decision." *Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000).

Once the plaintiff establishes a prima facie case, the burden of production shifts back to the defendant to show that it had a "legitimate, non-discriminatory basis" for its action. *Cline*, 206 F.3d at 658. If it does so, then to avoid summary judgment, the plaintiff must show "that a reasonable juror could find that the defendant's reasons were pretextual." *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 667 (6th Cir. 2020). In *Barnes v. GenCorp Inc.*, a case involving an age-discrimination suit, this court held that in the context of a workforce reduction, the plaintiff "does not make out a prima facie case absent additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." 896 F.2d 1457, 1465 (6th Cir. 1990). Although this court "has not addressed the question whether the *Barnes* additional-evidence requirement applies to discriminatory termination claims on the basis of pregnancy," it has concluded that "it is unnecessary . . . to reach this question because showing a nexus between the pregnancy and a termination . . . should meet the *Barnes* additional-evidence requirement." *Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006).

The dissent contends that Bunnell must show that she was treated differently from similarly situated employees. 42 U.S.C. § 2000e provides that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same . . . as other persons not so affected but similar in their ability or inability to work . . . ." And, as the dissent notes, in *Young v. United Parcel Serv.*, 575 U.S. 206, 211 (2015), the Supreme Court read this provision to authorize disparate-treatment claims on the basis of pregnancy. But § 2000e does not foreclose Bunnell's pregnancy-discrimination claim. Unlike the plaintiff in *Young*, Bunnell does not base her pregnancy-discrimination claim on her employer's failure to give her the same accommodations as other employees who are not pregnant but are limited in their ability to work.

8

Accordingly, Bunnell does not need to demonstrate that she was treated less favorably than non-pregnant employees with similar limits on their ability to work in order for her pregnancy-discrimination claim to survive summary judgment. She need only show a nexus between her lay off and her pregnancy. *See Asmo*, 471 F.3d at 593.

In her objections to the R&R addressing pretext in Zeiter's choice of employees to lay off, Bunnell asserted that despite making exceptions for other employees, Zeiter failed to consider the responsibilities she had that affected her procedure counts. Bunnell also asserted that Zeiter excluded several types of procedures from the productivity data she used. And she took issue with Zeiter's heavy reliance on portable-scan data because Zeiter controlled the portable-scan shift schedule.

The district court rejected these arguments, adopting the R&R's conclusion that "Zeiter did not select data to make it appear that Plaintiff was unproductive"—rather, Zeiter and Burgett "'attempted to put everybody on the same playing field' and calculated performance based on hours worked and 'how many studies people did per hour worked.'" (R. 27, PID 2032 (quoting R. 20-28, PID 930–31); *see* R. 35, District Court Order, PID 2205–06). It also adopted the R&R's determination that "[b]ecause the layoffs occurred amid furloughs throughout the hospital, and [Beaumont] can offer that the reason for the layoff was objective productivity data, [Beaumont] has established a legitimate, nondiscriminatory reason for the decision." (R. 27, PID 2030; *see* R. 35, PID 2205–06).

On appeal, Bunnell asserts that the district court improperly made a factual determination when it stated that Zeiter did not intentionally select data to make Bunnell appear unproductive. She further argues that the district court ignored evidence that Zeiter was responsible for the shift

assignments that caused Bunnell's low number of portable scans and that Zeiter knew emphasizing the number of portable scans employees completed would disfavor Bunnell.

"When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) (citation omitted). But Bunnell has not merely asserted that Zeiter used flawed decision-making criteria; rather, she has presented evidence that Zeiter was concerned about Bunnell's pregnancy affecting the department's productivity. Thus, Bunnell has demonstrated a dispute of material fact regarding whether Beaumont honestly relied on objective data rather than choosing her for layoff because of her pregnancy.

This case is similar to *Asmo*. 471 F.3d 588. As the dissent notes, the facts of *Asmo* are not on all fours with this case. But there are relevant similarities that support reversing the grant of summary judgment on Bunnell's pregnancy-discrimination claim.

The employer in *Asmo* selected a pregnant recruiter for layoff, and the employee responsible for choosing a recruiter for layoff stated that he decided based on "(1) relative tenure; (2) the number of hires each [] Recruiter had made in 2001; and (3) the forecasted hiring needs for 2002." *Id.* at 591. He also told the plaintiff that she was selected for layoff because "[her] expenses [we]re a lot more expensive than the other recruiters," her salary was higher than that of other recruiters, and she did not get as much "face time" as other recruiters. *Id.* at 591–92. This court reversed the district court's grant of summary judgment in favor of the employer. *Id.* at 598. It stated that "[t]he most significant evidence showing pretext is [the decisionmaker]'s conduct after [the plaintiff] announced she was pregnant with twins," noting that all her other colleagues except him congratulated her while he remained silent. *Id.* at 594. It went on to explain,

10

"[The decisionmaker]'s silence is evidence of pretext because it can be read as speculation regarding the impact of [the plaintiff]'s pregnancy on her work, and an employer's speculation or assumption about how an employee's pregnancy will interfere with her job can constitute evidence of discriminatory animus." *Id.* at 595. In this case, Bunnell has presented evidence that Zeiter felt that Bunnell's pregnancy was interfering with her job—Zeiter stated, "[W]e are being looked at heavily on our productivity and things like that" (R. 23-4, PID 1847) and said that Bunnell's requests for accommodations "could be a potential strain on the department" (*id.*, PID 1849).

Further, in *Asmo*, 471 F.3d at 597, the "evidence support[ed] an inference that [the decisionmaker] may have already decided he was going to lay off [the plaintiff]" before he investigated the relevant factors. The decisionmaker asserted that the plaintiff's assigned region "had the least need for a recruiter." *Id.* But when he spoke with the vice president of the plaintiff's region, he asked a "leading question": "[I]s it fair to say that you're not really projecting much new hiring in your area?" *Id.* The decisionmaker also stated that he did not consider the recruiters' performance in his decision because they all performed similarly well, apparently disregarding the fact that one of them had received two critical reviews from clients. *Id.* at 597–98. The court also noted that there were five open positions in the plaintiff's region at the time of her layoff, stating, "This evidence alone cannot support [the plaintiff]'s claim because neither side presented evidence about the number of positions open at the time of her discharge in other regions, but this would be an important point for further investigation upon remand." *Id.* at 597.

Like the plaintiff in *Asmo*, 471 F.3d at 595–98, Bunnell has presented additional evidence that the reasons Zeiter gave for selecting her for layoff were pretextual. For example, when viewing data for the relevant period during her deposition, Zeiter testified that Bunnell worked 471 hours in the Women's Heart Center, an outpatient setting, during that period. Zeiter stated

that all ultrasonographers had portable rotations and several had rotations in other outpatient centers, but she did not name any other ultrasonographers who had rotations in the Women's Heart Center. In deciding who to recommend for layoff, Zeiter included both inpatient and outpatient procedures in the procedure counts she considered. When asked whether she could have considered only inpatient procedures, she said, "I could have, but I did not," because "this process is how I felt was the fairest way to look at it." (R. 20-29, PID 1164–65). She admitted that it was possible that the Women's Heart Center had more no-show appointments than other outpatient settings, which could have caused Bunnell to have lower procedure counts than other ultrasonographers.

Additionally, Zeiter testified that she thought she assigned portable-scan shifts equally, but she admitted that she did not count the number of portable-scan shifts assigned to each employee and that some employees could have had more portable-scan shifts than others. She also admitted that she did not consider portable-scan volume per shift or per hour. Further, Bunnell notes that she worked the second-highest number of hours among employees in her department from January through December of 2019, which Zeiter's deposition testimony confirms. The fact that Bunnell was selected for layoff despite working a relatively high number of hours, though not dispositive as to pretext, is significant.

As the dissent notes, we cannot substitute our judgment for Beaumont's when it comes to "business judgments." (Dissent at 24 (quoting *Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) (further citation omitted))). But the information about Bunnell's productivity discussed above, combined with Zeiter's statements evincing animus, create a question of fact regarding pretext. Additionally, as the dissent observes, the fact that Zeiter investigated Bunnell's productivity after seeing her name on the list of employees suggested for layoff rather than

12

immediately selecting her for layoff cuts against Bunnell's theory of animus. But there remains sufficient evidence of animus to create a question of fact.

Bunnell relies on the cat's-paw theory of liability. "Cat's paw liability . . . rests on the premise that organizational employers do not operate in a vacuum, and that a decisionmaker might rely on the recommendation of a biased lower-level supervisor." *Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 380 (6th Cir. 2017). In this case, although Burgett had the authority to approve or disapprove Zeiter's layoff recommendations, Bunnell asserts that Zeiter was biased against her because of her pregnancy and recommended her for a layoff for this reason.

Bunnell notes that when she gave Zeiter a doctor's note stating that she was not to enter contact rooms, Zeiter "expressed that [she was] disappointed in [Bunnell] for getting a doctor's note" and said Bunnell was "putting a strain on our department." (R. 23-4, Conversation with Zeiter, PID 1847). When evaluating such remarks, "courts must carefully evaluate factors affecting the statement's probative value, such as the declarant's position in the [employer's] hierarchy, the purpose and content of the statement, and the temporal connection between the statement and the challenged employment action, as well as whether the statement buttresses other evidence of pretext." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 393 (6th Cir. 2009) (citation omitted). In this case, Zeiter's remarks are highly probative, as they indicate that she was concerned about how Bunnell's pregnancy was affecting her department's productivity. Additionally, Zeiter was responsible for recommending which employees to lay off, which makes the content of her statements highly relevant to the question of pretext. And Zeiter selected for layoffs the only two employees in her department who were, or had recently been, pregnant.

Accordingly, the district court erred in dismissing Bunnell's pregnancy-discrimination claims.

**B.**

Bunnell also asserts that the district court erred in dismissing her disability-discrimination claims. Bunnell alleges that she faced discrimination because of her severe morning sickness, which she claims is a disability covered by the ADA and the PWDCRA. To establish a prima facie case of disability discrimination under either statute, Bunnell must show that she is an individual with a disability, that she is otherwise qualified to perform the job requirements, with or without reasonable accommodation, and that Beaumont discharged her solely because of the disability. *See Donald v. Sybra, Inc.*, 667 F.3d 757, 763–64 (6th Cir. 2012). Although pregnancy, by itself, is not a "disability" under the ADA, some pregnancy complications can predicate a claim of disability discrimination. *See Spees v. James Marine, Inc.*, 617 F.3d 380, 396 (6th Cir. 2010); *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 606 (6th Cir. 2018).

Bunnell has not shown a dispute of material fact as to disability discrimination under the ADA and PWDCRA. She asserts that her "disability accommodation was taken from her" when she was removed from her scrub-distribution shifts for a week and that Zeiter "fail[ed] to take any action" to uphold Bunnell's rights. (Reply Br., 10). Bunnell argues that although a manager in another department complained about "the staff" on her scrub-distribution shift being unprofessional, "[n]o specific complaints were levied against [her]." (Appellant Br., 13). But the email complaining about the staff on the April 11th shift stated that "Jackilyn Bunnell and [two other employees] have all been very difficult to work with tonight." (R. 20-15, PID 329). Thus, the record supports that the one-week removal from the scrub-distribution shift was based on Bunnell's behavior, rather than discriminatory animus. And Bunnell has not shown that the other two employees mentioned in the email were treated differently. Bunnell also argues that the district court ignored evidence that her severe morning sickness was a covered disability under the

14

ADA, even though pregnancy alone is not a covered disability. But there is no evidence that Zeiter or any other Beaumont employees knew about her severe morning sickness, which was not mentioned in her doctor's note.

For these reasons, the district court properly dismissed Bunnell's disability-discrimination claims.

## C.

Bunnell asserts that the district court erred in dismissing her retaliation claims under Title VII, the ELCRA, the ADA, and PWDCRA. To establish a prima facie case of retaliation under Title VII or the ELCRA, a plaintiff must show that (1) she engaged in protected activity; (2) her "exercise of her protected rights was known to defendant;" (3) "an adverse employment action was subsequently taken against [her] or [she] was subjected to severe or pervasive retaliatory harassment by a supervisor;" and (4) "there was a causal connection between the protected activity and the adverse employment action or harassment." *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013); *see Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012). An analogous test applies in retaliation cases under the ADA and PWDCRA. *See Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014); *E.E.O.C. v. Hosanna-Tabor Evangelical Lutheran Church & Sch.*, 597 F.3d 769, 776 n.5 (6th Cir. 2010).

Bunnell engaged in protected activity when she said to Zeiter, "I would never expect a manager to say those words to an employee ever under any circumstances. To tell them they are a strain on their department because they are pregnant." (R. 23-4, PID 1849); *see EEOC v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015) ("[A] demand that a supervisor cease his/her harassing conduct constitutes protected activity covered by Title VII."). But Bunnell presents no

15

evidence of a causal connection between her complaint about Zeiter's comment and Zeiter's recommending her for a layoff.

Zeiter recommended Bunnell for layoff in April 2020—relatively soon after her February 2020 protected activity. But "temporal proximity, standing alone, is [typically] insufficient to establish a causal connection for a retaliation claim." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007). In a "limited number of cases . . . where an employer fires an employee immediately after learning of a protected activity, we can infer a causal connection between the two actions, even if [the employee] had not presented other evidence of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). But this is not such a case. Therefore, to avoid summary judgment, Bunnell had to provide additional evidence that her complaint to Zeiter contributed to Zeiter's decision to recommend her for layoff. *Compare Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 718 (6th Cir. 2007) (affirming summary judgment on retaliation claim where plaintiff showed temporal proximity between protected activity and termination but "failed to provide sufficient additional evidence of retaliatory conduct"), *with Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999) (finding sufficient evidence of causal connection when plaintiff alleged that "the other employees were instructed by management not to talk to him, go into his area or otherwise interact with him" after his protected activity), *and Tuttle*, 474 F.3d at 321 (finding sufficient evidence of causal connection when an HR manager "threatened [plaintiff] that he was going either to demote her or to cut her wages if she did not transfer voluntarily into another Metro department, which [plaintiff] viewed as a reaction to her EEOC complaint").

Bunnell has presented no such evidence. Rather, she merely makes a conclusory assertion that Zeiter's decision to recommend her for layoff may have been motivated by "[r]etaliatory"

intent. (Appellant Br., 34). Further, the rest of Bunnell's conversation with Zeiter after she complained about her behavior does not indicate that Zeiter harbored hostility toward Bunnell for the complaint. Zeiter made several statements acknowledging that she was in the wrong, including: "It was defensive on my part. Yes[,] it was my stress that I put on you" (R. 23-4, PID 1850); "The stress on me shouldn't be reflected on you" (*id.*, PID 1851); "I am correcting myself because I was wrong" (*id.*, PID 1856); and "I was defensive and I should not have been" (*id.*, PID 1861). Therefore, Bunnell has failed to establish a retaliation claim under Title VII or ELCRA. Additionally, her retaliation claims under the ADA and PWDCRA fail because she does not allege that she complained about facing discrimination due to her severe morning sickness.

Accordingly, the district court properly dismissed Bunnell's retaliation claims under Title VII, ELCRA, the ADA, and PWDCRA.

**D.**

Bunnell next asserts that the district court improperly dismissed her FMLA interference and retaliation claims. "Our court has recognized two discrete theories of recovery under the FMLA: (1) the so-called 'interference' or 'entitlement' theory arising from § 2615(a)(1), and (2) the 'retaliation' or 'discrimination' theory" under § 2615(a)(2). *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012) (citation omitted). Section 2615(a)(1) prohibits an employer from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of . . . any right provided under this subchapter," while § 2615(a)(2) prohibits an employer from "discriminat[ing] against any individual for opposing any practice made unlawful by this subchapter."

Bunnell asserts that Zeiter failed to inform her of the Dearborn position because she took FMLA leave, but she presents no evidence that she opposed this action or that she faced retaliation for doing so. Thus, Bunnell's retaliation claim cannot survive summary judgment.

17

Bunnell's allegations are better suited to the interference theory. "The Act's prohibition against interference prohibits an employer from discriminating . . . against an employee or prospective employee for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c). Therefore, "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." *Id.*; *see also Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007) ("If an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled."). To establish a prima facie case of FMLA interference, a plaintiff must show:

> (1) she availed herself of a protected right under the FMLA by notifying [her employer] of her intent to take leave, (2) she suffered an adverse employment action, and (3) that there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action.

*Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). The third element is at issue in this case.

Bunnell has established a genuine dispute of material fact as to whether Zeiter chose not to inform her of the Dearborn position because she was on FMLA leave. Zeiter knew that Bunnell was cleared for work on the day she received the email inquiring about Bunnell's availability for the Dearborn position. Despite this knowledge, when responding to the email that same day, Zeiter stated that "[Bunnell] was furloughed and went from layoff to Medical Leave as she had a baby in the middle of her layoff status"—failing to mention that Bunnell could return to work as of that very day. (R. 23-16, Emails with Dearborn Location, PID 1952)).

The district court found no dispute of material fact as to interference, reasoning that Bunnell's supervisors at Beaumont's Royal Oak location did not "have any oversight at the Dearborn location." (R. 27, PID 2023 (quoting R. 20-28, PID 836)). But that ignores that an

18

employee at the Dearborn location informed Zeiter of the position and specifically inquired about Bunnell's interest in it. The district court also quoted Burgett's testimony that instructions on identifying positions for furloughed employees were "very specific" and provided by HR. (R. 27, PID 2051 (quoting R. 20-28, PID 1008)). But there is no evidence that these instructions precluded Zeiter from informing Bunnell of the Dearborn position, or informing the Dearborn employee making the inquiry about Bunnell's work clearance.

Additionally, although Zeiter framed the decision not to inform Bunnell of the Dearborn position as a joint decision between her and Burgett, Burgett appeared to have learned for the first time during her deposition that Bunnell was not informed of the position. When asked why Zeiter did not mention the position to Bunnell, Burgett responded:

> I don't know. There was no – honestly, we would be happy to help facilitate getting her work. We know she wanted to work, so there was no interest on our part for her not to work somewhere in Beaumont Health. We really wanted her to.

(R. 20-28, PID 1030). When asked whether she would be surprised to learn that Zeiter never informed Bunnell of the position, Burgett stated:

> Yeah, I would be surprised. I don't remember having a conversation with Tracy that would in any way deter Jackilyn from getting a full-time job somewhere. I think what we talked about was trying to make sure that she knew that there were jobs available for her because we weren't sure if we would be able to bring her back based on our volume.

(*Id.*, PID 1031). Thus, there is evidence from which a reasonable juror could conclude that Zeiter's account of the decision not to inform Bunnell of the Dearborn position was untrue, that Burgett would have informed Bunnell of the position, and that Zeiter was penalizing Bunnell for taking FMLA leave.

Accordingly, the district court erred in dismissing Bunnell's FMLA interference claim.

19

## III.

For the reasons set out above, we AFFIRM the grant of summary judgment on Bunnell's disability-discrimination and retaliation, pregnancy-discrimination-based retaliation, and FMLA retaliation claims, and REVERSE the grant of summary judgment on Bunnell's pregnancy-discrimination and FMLA-interference claims.

MURPHY, Circuit Judge, concurring in part and dissenting in part. I agree with how my colleagues resolve most of Jackilyn Bunnell's claims against William Beaumont Hospital. But I would affirm the district court's grant of summary judgment to Beaumont on Bunnell's pregnancy-discrimination claims under Title VII and the Elliott-Larsen Civil Rights Act. I thus respectfully dissent from Part II.A of the majority opinion.

Title VII makes it "an unlawful employment practice for an employer" "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]" 42 U.S.C. § 2000e-2(a)(1). And the statute defines "because of sex" to include "because of or on the basis of pregnancy, childbirth, or related medical conditions[.]" *Id.* § 2000e(k). The statutory definition adds that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work[.]" *Id.* The Supreme Court has read this text to authorize standard disparate-treatment claims that require employees to prove that an employer intentionally took a harmful action against them because of their *protected trait* (pregnancy) rather than *some other reason* (say, their inability to perform their job duties). *See Young v. United Parcel Serv.*, 575 U.S. 206, 212–13 (2015). Apart from these standard claims, the Court has also held that employers may sometimes violate Title VII if they refuse to grant pregnant employees accommodations for their pregnancies when they grant accommodations to other employees "similar in their ability or inability to work." *Id.* at 229 (quoting 42 U.S.C. § 2000e(k)). (The parties agree that Michigan law follows the same standards, so I need not discuss it separately.)

As far as I can tell from her briefing, Bunnell has asserted only a standard disparate-treatment claim (not the unique pregnancy-related claim tied to a failure to accommodate). And

21

she has based this claim on only one adverse action: her temporary layoff in April 2020. So the parties agree that this claim follows the same burden-shifting framework that we apply to discrimination claims based on any other protected trait (such as race). *See McClellan v. Midwest Machining, Inc.*, 2022 WL 203205, at *3–4 (6th Cir. Jan. 24, 2022); *Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000). Bunnell must first establish a prima facie case of discrimination. *See Kubik v. Cent. Mich. Univ. Bd. of Trs.*, 717 F. App'x 577, 581 (6th Cir. 2017). The burden then shifts to Beaumont to identify a neutral reason for Bunnell's layoff. *See id.* The burden lastly returns to Bunnell to produce evidence that would allow a reasonable jury to find that the hospital's identified reason was false and that Bunnell's pregnancy motivated her layoff. *See id.*; *see also Megivern v. Glacier Hills Inc.*, 519 F. App'x 385, 395 (6th Cir. 2013).

The parties do not dispute the first two of these steps. They agree that Bunnell made out a prima facie case of pregnancy discrimination. And they agree that Beaumont identified a neutral reason for the layoff: Bunnell's supervisor, Tracy Zeiter, recommended that Beaumont lay off Bunnell because objective data showed that she was one of the least productive ultrasonographers in Zeiter's department. This case thus turns on whether Bunnell has introduced enough evidence from which a reasonable jury could find Beaumont's productivity justification pretextual.

Like the district court, I would hold that Bunnell has not met this final burden. To start, all agree that Beaumont needed to discharge many employees because of the economic shock caused by the COVID pandemic. That shock led the hospital to eliminate "450 positions" and place another nearly 2,250 employees on "temporary layoff." Newsletter, R.20-16, PageID 331. These actions took place "across the entire hospital," not just in Bunnell's department. Burgett Dep., R.20-28, PageID 852. And they "unquestionably occurred," *Gatch v. Milacron, Inc.*, 111 F. App'x 785, 791 (6th Cir. 2004), for "valid business reasons," *Madry v. Gibraltar Nat'l Corp.*, 526

F. App'x 593, 597 (6th Cir. 2013). No reasonable jury could believe that the hospital would dramatically reduce its workforce as a pretext to lay off Bunnell because of her pregnancy.

Next, Bunnell tries to prove pretext on the sole ground that her supervisor—Zeiter— harbored animus against her pregnancy. But Zeiter did not participate in the general decision to impose layoffs on her department. Rather, Lauren Burgett, the Director of Nursing for Heart and Vascular, made this decision in coordination with the Human Resources Department based on the hospital's "current volumes" of echocardiogram tests. Burgett Dep., R.20-28, PageID 789, 852–53. Burgett also gave Zeiter a "list" of the specific employees that Beaumont should lay off. Zeiter Dep., R.20-29, PageID 1136–37. Bunnell's name made this initial list. As a result, the first recommendation to discharge Bunnell had no connection to the alleged discriminator: Zeiter.

Indeed, Zeiter initially challenged Burgett's recommendation. Zeiter agreed that the hospital should lay off two employees on Burgett's list because one had already resigned and the other had already taken leave. But Zeiter saw "no clarity" as to why Bunnell had made this list, and she sought to identify the two other employees to discharge in "as objective" a manner "as possible." *Id.* This conduct makes it implausible that Zeiter later pushed for Bunnell's discharge because of her pregnancy. If Zeiter had harbored this illegal animus, why wouldn't she have simply gone along with Burgett's initial recommendation to lay off Bunnell?

Ultimately, Zeiter did rely on objective data (from 2019) when she recommended Bunnell's layoff. This data contained a variety of metrics, including hours worked, number of tests performed, the ratio between hours worked and the number of tests, and the number of "portable" tests performed in a patient's room (rather than in the lab). *Id.*, PageID 1139–40. The data showed that Bunnell had performed the second least number of tests in 2019 and was the second least productive employee in terms of the number of hours that she worked per test. Chart, R.20-17,

PageID 334. Zeiter's reliance on this data makes this case unlike those in which an employer has relied on easy-to-manipulate "subjective criteria" to take an adverse action against an employee. *Brewer v. New Era, Inc.*, 564 F. App'x 834, 843 (6th Cir. 2014); *see Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc.*, 690 F.2d 88, 93 (6th Cir. 1982) (per curiam).

In response, Bunnell nitpicks the data. She notes that Zeiter partially relied on "portable" tests but chose who got to perform these tests with her oversight of the portable-shift schedule. Appellant's Br. 14. Bunnell adds that she worked many hours in an area of the hospital (the Women's Health Center) with a lot of "no shows," which decreased her total volume. *Id.* But Zeiter testified that she generally assigned portable shifts "evenly" to all ultrasonographers. Zeiter Dep., R.20-29, PageID 1145. Besides, Bunnell fell second to last for *total* tests—not *portable* tests. Chart, R.20-17, PageID 334. And she fails to support her claim about the unproductivity of the Women's Health Center with objective data of her own. So Bunnell must rely on "subjective" beliefs to disparage Zeiter's data. But her "'subjective view of her' job performance" does not create a jury question on pretext. *Okakpu-Mbah v. Postmaster Gen. of U.S.*, 2022 WL 3928534, at *4 (6th Cir. Aug. 31, 2022) (quoting *Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004)). At the least, we must respect the employer's "business judgments" about how best to measure employee efficiency. *Hedrick*, 355 F.3d at 462 (citation omitted).

Bunnell next claims that she has "direct evidence" of Zeiter's animus—that is, evidence that shows this animus without the need for any inferences. *Pike v. ABF Freight Sys., Inc.*, 478 F. App'x 295, 297 (6th Cir. 2012). Bunnell points to statements that Zeiter made to her in February 2020. At that time, Bunnell asked to avoid patients with infectious diseases. An "upset" Zeiter responded by calling Bunnell a "disappointment" and suggesting that the request would put a "strain on their department" by forcing others to perform extra work. Bunnell Dep., R.20-27,

24

PageID 495. Zeiter admitted that her response had been "inappropriate and insensitive," so she quickly apologized to Bunnell (in a conversation that Bunnell secretly recorded). Zeiter Dep., R.20-29, PageID 1058. Despite her words, Zeiter also provided Bunnell with all the "accommodations" that she ever requested. *Id.* And regardless, this evidence does not show that Zeiter harbored animus against Bunnell's *pregnancy* (as compared to her requested *accommodation*). The two are not the same. Unlike the Americans with Disabilities Act, Title VII generally requires employers to treat employees *equally*; it does not require them to treat employees *preferentially*. In other words, unless Beaumont granted accommodations to others "similar in their ability or inability to work," Title VII would not have required Zeiter to grant the requested accommodation. *Young*, 575 U.S. at 229 (quoting 42 U.S.C. § 2000e(k)). So I fail to see how her comment about the accommodation evinces pregnancy discrimination. And Bunnell has not identified any derogatory comments that Zeiter made about Bunnell's pregnancy. To the contrary, when Bunnell told Zeiter that she was pregnant, Zeiter responded with "congratulations" (in another conversation that Bunnell secretly recorded). Tr., R.20-4, PageID 241.

My colleagues raise several arguments that Bunnell did not mention. They note that Zeiter exempted a "Technical Director" from her list of rankings because this employee had "752 +" hours of "[a]dmin time" and so did not conduct a lot of tests. Chart, R.20-17, PageID 334. Bunnell likely did not raise this argument because she recognized it would be unfair to compare an employee with "a different job responsibility" to the ultrasonographers. Zeiter Dep., R.20-29, PageID 1144. Indeed, Zeiter also did not place *herself* in the rankings. Does this omission likewise provide evidence that she acted with animus? No, the well-established requirement for comparator employees to be "similarly situated" rebuts this claim. *Okakpu-Mbah*, 2022 WL 3928534, at *4.

25

My colleagues also identify many more factors that Zeiter might have considered. To name a few, Zeiter could have evaluated all the administrative duties that all the ultrasonographers occasionally performed. She could have isolated inpatient procedures. And she could have researched the precise number of portable shifts that each ultrasonographer worked. But Zeiter responded to these concerns: "Again, I was making the best possible decision I could in that moment in time. It was an unexpected ask and I was asked to deliver it the next day." Zeiter Dep., R.20-29, PageID 1164–65. She did not have the many months that this litigation has progressed to make her decision. And by criticizing the criteria that she chose in the short amount of time that she had, my colleagues "inappropriate[ly] . . . substitute [their] judgment for that of management." *Hedrick*, 355 F.3d at 462 (quoting *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000)).

My colleagues next invoke our decision in *Asmo v. Keane, Inc.*, 471 F.3d 588 (6th Cir. 2006). But Bunnell did not even cite this decision—let alone rely on it. For good reason. In *Asmo*, we held that an employee created a fact question over whether her employer's reasons for terminating her were pretext for pregnancy discrimination. *Id.* at 594–98. As the "most significant evidence showing pretext," *Asmo* noted that the employee's supervisor had not offered any "congratulatory words" when learning of her pregnancy. *Id.* at 594. Here, on the other hand, Zeiter congratulated Bunnell and discussed accommodations with her. *Cf. McClellan*, 2022 WL 203205, at *6. *Asmo* also found evidence of pretext because the employee's job required a lot of travel and the employee was having "*twins*, which most people know is a tremendous responsibility." 471 F.3d at 594–95. This case contains neither factor. Further, another manager in *Asmo* had made remarks to the employee suggesting that her supervisor acted with animus. *Id.* at 595. But Bunnell has identified no similar statements from Zeiter's colleagues. Lastly, the employer in *Asmo* "change[d]" its "rationale" for why it had terminated the employee. *Id.* at 596.

26

Beaumont, by contrast, has consistently relied on Zeiter's data as the basis for its decision. In short, "[t]his case is not remotely similar" to *Asmo*. *McClellan*, 2022 WL 203205, at *6.

All this said, I do agree with my colleagues that we must reverse the district court's decision to grant Beaumont summary judgment on Bunnell's interference claim under the Family and Medical Leave Act. I agree that Bunnell has established a genuine issue of material fact over why Zeiter did not tell her in October 2020 about the open position at Beaumont's Dearborn hospital. If Zeiter hid this information because of Bunnell's decision to take protected leave, she may well have improperly "interfere[d] with" that leave. 29 U.S.C. § 2615(a)(1). Beaumont does counter that Bunnell lacks evidence that she "would have been offered the position" or that she "would have accepted the offer" if Zeiter had notified her about it. Appellees' Br. 52–53. I would leave how these other issues might affect this interference claim for further litigation on remand.

All told, I concur in part and dissent in part.